640 So.2d 865 (1994)
Christopher J. McCANN, III and
Vickilynn M. McCann
v.
ABC INSURANCE COMPANY, et al.
No. 93-CA-1789.
Court of Appeal of Louisiana, Fourth Circuit.
July 14, 1994.
*867 Lawrence J. Smith, Lawrence J. Smith & Associates, New Orleans and Gary L. Boland, Hunter & Boland, Baton Rouge, for plaintiffs/appellees.
Philip D. Lorio, III, Deutsch, Kerrigan & Stiles, New Orleans, for defendants/appellees.
John Neely Kennedy, Corinne A. Morrison, Douglas L. Grundmeyer, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for defendant/appellant.
Before JONES, WALTZER and LANDRIEU, JJ.
JONES, Judge.
This medical malpractice action was instituted by Christopher J. McCann, III and his wife Vickilynn M. McCann against Pendleton Memorial Methodist Hospital (Methodist Hospital), Dr. Berkeley S. Merrill (Dr. Merrill), Mrs. McCann's attending physician, Berkeley Merrill, the Medical Corporation that employed Dr. Berkeley Merrill, and several other health care providers. Plaintiff's sought damages for the wrongful death of their infant son, Christopher McCann IV. Following a jury trial, judgment was rendered in favor of the plaintiff's and against the Louisiana Patient's Compensation Fund (LPCF), appearing through nominal defendant, Methodist Hospital in the amount of four hundred thousand dollars ($400,000) plus interest from date of judicial demand.
Defendant, the LPCF appeals the judgment of the trial court.

FACTS
Plaintiff, Vickilynn McCann entered Methodist Hospital at approximately 10:15 p.m. on June 12, 1984 in early, spontaneous labor. She continued in labor through June 13, 1984 under the care of her physician, Dr. Merrill. By noon, Mrs. McCann's cervix had dilated to only five centimeters. At this time Dr. Merrill discussed the possibility of a cesarean section delivery with Mrs. McCann, who had previously indicated to Dr. Merrill that she preferred not having a cesarean section, but wanted to deliver the baby vaginally, if at all possible. Subsequently, Mrs. McCann dilated further and was reinjected with an epidural anesthetic at 7:05 p.m. Shortly before 7:30 p.m. Dr. Merrill examined Mrs. McCann again and decided to attempt a vaginal delivery of the baby with forceps. Dr. Merrill informed Mrs. McCann that if the attempted forceps delivery was unsuccessful, he might have to perform the cesarean section. At approximately 7:28 p.m., prior to the attempted forceps delivery, the electronic fetal monitor which had been in use and which had monitored the baby's heartbeat was disconnected. According to the fetal monitor strips and the medical testimony of the experts, the baby was in very satisfactory condition prior to the time the monitor was disconnected and Mrs. McCann was moved to the delivery room.
An attempt to deliver the baby with forceps was made at approximately 7:40-7:45 p.m. However, the attempt was unsuccessful. Dr. Merrill testified that he auscultated (i.e. listened to the baby's heart tone with a stethoscope) immediately after the failed forceps attempt and that at that time the baby had a normal heartbeat. After the unsuccessful forceps delivery, Dr. Merrill gave orders to prepare for a cesarean section. At that time, Nurse McMullen, the delivery room nurse, called another nurse who notified a pediatrician and an anesthesiologist. Mrs. McCann was moved to the surgery room at 8:00 p.m., given an additional epidural anesthesia and prepared for surgery. The c-section incision was made at approximately 8:10 p.m. and the baby was delivered at 8:20 p.m. At birth the baby was not breathing and had no detectable heartbeat. However, the baby was resuscitated with oxygen and transferred to Southern Baptist Hospital wherein he went into an irreversible coma and was in a clinically brain-dead state within 24 hours. The baby was kept alive for 24 days on life support devices until the decision *868 was made to discontinue the life support system, wherein the baby died. Following the death of the baby, the McCanns instituted this litigation.
Plaintiffs initially instituted this litigation against the hospital, Dr. Merrill, the pediatrician, and the anesthesiologist. The plaintiffs subsequently dismissed with prejudice their claims against the pediatrician and the anesthesiologist, but continued to proceed against Dr. Merrill and the Hospital.
Prior to trial, Methodist Hospital settled with the plaintiffs for $75,000. However, Methodist Hospital remained a nominal party in the litigation for purposes of determining the liability of the Louisiana Patient's Compensation Fund (LPCF). At the conclusion of the plaintiffs' case, the trial court denied Dr. Merrill's motion for a directed verdict. However, at the end of the trial, the trial court granted the motion for a directed verdict and dismissed Dr. Merrill. Thus, the only remaining defendant in the litigation was the LPCF, the entity responsible for any excess amount owed by Methodist Hospital.
Following instructions and interrogatories addressing the Hospital's standard of nursing care, the jury found that the plaintiffs proved by a preponderance of the evidence the standard of care required of the hospital in this case. The jury further found that the hospital either lacked the degree of knowledge or skill or failed to use reasonable care and diligence in the application of that skill and that this failure of the hospital, through its nurses, was more probable than not a substantial factor in reducing the baby's chance of survival.
The jury awarded the plaintiffs a total of $500,000 against the nominal defendant, Methodist Hospital. The trial judge recognized the fact that the LPCF was entitled to a credit in the amount of one hundred thousand dollars; thus, judgment was rendered in favor of the plaintiffs and against the LPCF in the amount of four hundred thousand dollars ($400,000) plus interest from date of judicial demand.

DISCUSSION AND LAW
On appeal the LPCF argues six assignments of error. More specifically the LPCF argues that 1) the trial court erred in dismissing co-defendant Dr. Berkeley S. Merrill on a directed verdict and failing to submit jury interrogatories pertaining to his fault; 2) the trial court erred in excluding testimony concerning other possible causes of the baby's death and in failing to submit jury interrogatories on other possible causes of death; 3) the court erred in admitting evidence of plaintiff's medical expenses while excluding evidence of their payment; 4) the plaintiffs did not prove their claim for funeral expenses; 5) the trial court erred in refusing to disqualify plaintiffs' counsel for a possible conflict of interest and to declare a mistrial; and 6) the jury's award is excessive and should be reduced.
Preliminarily, the appellees argue that Methodist Hospital, through the LPCF lacks standing to complain of the ruling granting a directed verdict in favor of Dr. Merrill.

STANDING TO COMPLAIN OF THE DIRECTED VERDICT
The first issue to be addressed in this appeal is whether the LPCF has standing to complain of the directed verdict in favor of Dr. Merrill.
Appellees argue that if Methodist Hospital wanted to keep Dr. Merrill in the case, it had a duty to file a third party demand against him. Since no third party demand was filed, appellees argue appellant lacks standing to challenge the directed verdict rendered in favor of Dr. Merrill. We disagree.
The primary objective of an appeal is to give an aggrieved party recourse to a superior tribunal for the correction a judgement of an inferior court. A party to the litigation has an unqualified right to appeal from an adverse final judgment and need not allege or show a direct pecuniary interest in order to be entitled to appeal. Andrade v. Shiers, 516 So.2d 1192, 1193 (La.App. 2 Cir. 1987), Delanzo v. ABC Corp., 572 So.2d 648 (La.App. 5th Cir.1990).
The appellant has the right to raise the issue of the solidary liability of a codefendant who has been dismissed, even in *869 cases where no third-party demand had been filed against the co-defendant and even though the plaintiff neither appealed independently or answered the appeal. Roy v. Edmonson, 221 So.2d 583 (La.App. 4th Cir. 1969); Wallace v. Pan American Fire & Casualty Co., 352 So.2d 1048, 1058 (La.App. 3rd Cir.1977).
The directed verdict dismissing Dr. Merrill had an adverse effect on the LPCF. If Dr. Merrill had been found liable in solido with the nominal defendant, Methodist Hospital, the amount for which the LPCF is now solely liable would be reduced. Because the LPCF was a party to the original litigation and is an aggrieved party, it has the necessary standing to appeal the dismissal of Dr. Merrill from the litigation.

Granting of the Directed Verdict
In its first assignment of error, appellant argues that the trial court erred in dismissing co-defendant Dr. Berkeley S. Merrill on a directed verdict and in failing to submit jury interrogatories concerning his fault.
La.C.C.P. art. 1810 allows the trial court to grant a directed verdict in favor of a defendant at the close of the plaintiff's case. A directed verdict should only be granted when the facts and inferences point so strongly in favor of one party that the court believes reasonable people could not reach a contrary verdict. It is appropriate, not when there is a preponderance of evidence, but only when the evidence overwhelmingly points to one conclusion. Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 718 (La.1986). A motion for a directed verdict should be denied where there is substantial evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. Roberts v. St. Bernard Parish School Bd., 427 So.2d 676, 677-678 (La.App. 4th Cir.) writ denied, 433 So.2d 1053 (La.1983). The court must always evaluate a directed verdict in light of the substantive law underpinning the plaintiff's claims. Moore v. Aetna Casualty & Surety Co., 454 So.2d 1273, 1277 (La.App. 2d Cir. 1984).
Plaintiffs' cause of action against Dr. Merrill was predicated primarily upon his failure to timely perform a cesarean section and his failure to monitor and/or order the continuous monitoring of the plaintiff Vickilynn McCann and the unborn infant.
The plaintiffs' claims against Dr. Merrill sound in medical malpractice. In order to recover in a medical malpractice case the plaintiff must prove by a preponderance of the evidence 1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians practicing in the defendant physician's medical specialty, 2) the physician either lacked that degree of knowledge or skill or failed to use reasonable care in the exercise of that skill; 3) the plaintiff's injuries were caused by the defendant's lack of knowledge or skill or failure to use reasonable care in the exercise of this skill and 4) damages.
A review of the evidence supports the trial court's finding that plaintiffs failed to introduce any expert testimony to establish malpractice on the part of Dr. Merrill. Accordingly, the trial court did not err when it granted the motion for a directed verdict.
The medical testimony adduced at trial established that during the delivery a severe hypoxic event occurred which caused the baby's brain to be deprived of oxygen. The cause of the severe hypoxic event was unknown. Not one expert called to testify could state the cause of the hypoxic event. Thus, plaintiffs' cause of action was dependent upon whether plaintiffs could show that Dr. Merrill or the hospital was negligent in failing to timely ascertain the existence of the hypoxic event so that attempts could be made to deliver the baby more quickly, thus increasing the baby's chance of survival.
Plaintiffs presented no expert testimony to prove that Dr. Merrill caused the hypoxic event to occur. Nor did plaintiffs present any expert testimony to show that Dr. Merrill was negligent in failing to perform the cesarean delivery at an earlier time. Thus the sole claim left against Dr. Merrill was the allegation that he failed to properly monitor the baby's heartbeat or see to it that the nurse properly monitored the baby's heartbeat *870 after the removal of the electronic fetal monitor. This failure allegedly constituted a substantial factor in causing the baby to lose its chance of survival.
At the trial of the case, plaintiffs alleged that good medical practice requires that auscultation be performed every ten minutes during delivery. In support of this allegation plaintiffs introduced into the record copies of standards for Obstetrical-Gynecological Services which had been published by the American College of Obstetrics and Gynecology. The applicable standard proved that once electronic fetal monitoring is disconnected during delivery, the fetal heart beats of the fetus should be monitored every ten minutes. The medical charts and testimony indicated that this did not occur. Thus, the inquiry to be addressed at trial was whether this failure to monitor constituted negligence on the part of Dr. Merrill. Dr. Merrill testified that his primary duty during delivery was to deliver the baby and that it was not possible for him to auscultate while performing the necessary surgery to deliver the baby. Auscultation, according to him was the sole duty of the nurse. Dr. Frank Boehm, the plaintiffs' expert, testified (via deposition testimony) that 1) he found no malpractice on the part of Dr. Merrill in this case; 2) that he had no criticism of the case "other than the standard which was to monitor every 10 minutes was lacking here and I think that impacted on the outcome"; and 3) the duty to monitor was a nursing responsibility rather than Dr. Merrill's responsibility. Additionally, Dr. Robert Ayerst, defendants' expert agreed with Dr. Boehm that Dr. Merrill did not commit medical malpractice in handling the plaintiff's case. Each physician who testified at trial testified that Dr. Merrill did not breach the standard of care in treating Mrs. McCann and no physician testified that Dr. Merrill was negligent.
The LPCF's argument that the lack of expert testimony on the issue of Dr. Merrill's negligence is not a sufficient reason for not letting the case go to the jury has no merit. The LPCF argues that under the recent case of Lasha v. Olin Corp., 625 So.2d 1002 (La. 1993), the fact that expert testimony is not submitted no longer ends the query in a medical malpractice case. The LPCF relies upon the following language in Lasha to support its argument:
... While expert medical evidence is sometimes essential, it is self-evident that, as a general rule, whether the defendant's fault, was a cause in fact of a plaintiff's personal injury or damage may be proved by other direct or circumstantial evidence. Jordan v. Travelers Ins. Co. [257 La. 995], 245 So.2d [151] at 155 [(1971)]: See Prosser, Torts, § 41, p. 269 (5th ed. 1984) ("Where the conclusion is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn. But on medical matters with common knowledge, no expert testimony is required to permit a conclusion as to causation") (Footnotes citing authorities omitted.) cf. Carpenter v. Nelson [257 Minn. 424], 101 N.W.2d [918] at 922 [(1960)], and authorities cited therein.
Lasha, id. at 1005.
This language does not obviate the need for expert testimony in all medical malpractice cases. The question to be addressed in cases wherein no expert testimony is presented to prove negligence is whether the alleged act is one from which a lay person can infer negligence based upon common knowledge or whether resort must be had to testimony demonstrating the standard of care within the medical profession. In Hastings, supra, the court gave illustrations of types of medical malpractice cases wherein it is not necessary to have expert testimony to establish a standard of care when it stated:
In some medical malpractice cases, expert testimony to establish a standard of care is unnecessary. When a physician does an obviously negligent act, such as fracturing a leg during an examination; amputating the wrong arm; carelessly dropping a knife, scalpel, or acid on a patient; or leaving a sponge in a patient's body, lay persons can infer negligence. Failure to furnish medical care to a patient with a serious head injury for a period of two hours can be judged by a common sense standard. Hammond v. Grissom, 470 So.2d 1049 (Miss.1985). Similarly, the *871 failure of an on-call physician to respond to a hospital emergency, when he knew or should have known his presence was necessary, is obviously negligence. Thomas v. Corso, supra [265 Md. 84, 288 A.2d 379 (1972)].
Hastings, id. at 719-720
Failure to supervise the nurse and make sure auscultation occurred every ten minutes does not fall into that category of acts from which a judge or jury can infer negligence. Rather, the issue is one that must be determined based on the standards for the medical profession. As such, some expert testimony was needed to show a violation of the appropriate standard of care by Dr. Merrill. Since plaintiffs failed to submit such testimony the trial court correctly granted the directed verdict.
The LPCF argues that sufficient evidence existed to raise a question as to whether Dr. Merrill was negligent in that Dr. Merrill testified that after the failed forceps delivery, he took the stethoscope and listened to the baby's heart tones. According to the LPCF the jury could possibly have concluded that the nurse must have seen him auscultate, and possibly concluded that he was going to do the auscultation. Thus, this evidence was sufficient to allow the case against Dr. Merrill to go to the jury. We disagree. The issue of whether Dr. Merrill actually auscultated is irrelevant, since no evidence was submitted to demonstrate that he had a duty to auscultate. Moreover, Nurse McMullen testified that she did not recall seeing Dr. Merrill auscultate and Mrs. McCann testified that during the entire time she was in the delivery room neither the doctor nor the nurse McMullen ever checked her stomach with a stethoscope to listen to the baby's heartbeat. No medical testimony was introduced to rebut any of the medical testimony that established that the nurse had the duty to auscultate, not the doctor. Thus, the lack of unanimity on the issue of whether Dr. Merrill auscultated does not affect the validity of the directed verdict.
When Dr. Merrill moved for a directed verdict at the close of the plaintiffs' case, the LPCF argued that the motion should be granted because no expert testimony had been submitted to show that Dr. Merrill had acted negligently. We agree. No expert testimony was presented to establish that Dr. Merrill violated the standard of care; hence, the trial court granted Dr. Merrill's motion for a directed verdict and dismissed him from the litigation.
Finally, the LPCF argues that the trial court erred when it submitted interrogatories to the jury which only allowed the jury to address the issue of whether the hospital was at fault. By granting the directed verdict the trial court implicitly found that Dr. Merrill could not be held liable, thus it would have been error to include the issue of his fault to the jury. Since no competent evidence existed from which the jury, as the trier of fact could have found some degree of fault on the part of Dr. Merrill, the trial court did not err when he failed to submit interrogatories inviting the jury to address the issue of Dr. Merrill's fault.

EXCLUSION OF TESTIMONY OF OTHER CAUSES OF DEATH
Next, appellant complains of the exclusion of portions of the testimony of Dr. Ayerest and Dr. Carlomagno concerning other possible causes of the infant's death and the failure to submit interrogatories concerning other causes of death to the jury.
In order to refute Dr. Boehm's conclusion on the causation of the infant's death, defendant sought to introduce the testimony of Dr. Ayerst and Dr. Carlomagno to show that the baby may have been born dead even if Dr. Merrill had performed the cesarean section as fast as he possibly could. The court refused to allow the defendant to ask questions concerning whether it was possible the baby could have been born dead even if certain conditions existed since the court felt this was too speculative and that there was no way for the plaintiffs to counter such testimony. Further, the court instructed the defendant that he had to ask the experts "about reasonable medical certainty", otherwise, according to the court, "all you had was a guessing game."
*872 Appellant argues that the trial court utilized the wrong legal standard in excluding the testimony sought to be introduced. Appellant argues the court erred by requiring that the expert be able to testify that "more probable than not" the referred to causes existed in this case and further that the stricter standard of "to a reasonable degree of medical certainty" clearly constituted reversible error. We agree.
In Lasha v. Olin, the court stated:
When the term "reasonable medical certainty" is used to describe the measure of persuasion in a tort case, it produces harmful error in two respects. First, it places upon the plaintiff a higher degree of proof than is required in the ordinary civil case.... To require plaintiff to prove defendant's negligence, for example, to "a reasonable certainty" is to require him to prove it to such degree as to leave no reasonable doubt, which is equivalent to saying that he must prove it beyond a reasonable doubt.... Second, because the word "medical" is susceptible of being construed as referring only to expert medical testimony, the use of the phrase "reasonable medical certainty" tends to preclude the trier of the facts from considering evidence other than that of expert medical witnesses....
Id. at 1005.
The defendant had no obligation to prove by a preponderance of the evidence that the other causes to which Drs. Ayerst and Dr. Carlomagno testified were true to "a reasonable degree of medical certainty"; rather, the burden of proving causation was on the plaintiffs. Since, pursuant to the holding in Lasha, id., it is error to require the plaintiff to prove causation "to a reasonable degree of medical certainty", it necessarily follows that it is prejudicial error to require the defendant to disprove causation "to a reasonable degree of medical certainty". Accordingly we agree with the LPCF that the trial court had no basis for requiring counsel for the LPCF to establish a lack of causation to a reasonable degree of medical certainty. Nevertheless, in the context of this case, this error on the part of the trial court was harmless because the underlying liability of the hospital was not premised upon any direct act constituting the sole cause of the baby's death.
Plaintiffs' cause of action against Methodist Hospital was predicated primarily upon its failure to have policies and procedures regarding the continuous monitoring of fetal heart tones and its failure to adequately and continuously monitor the unborn infant. The basic thrust of the case was that none of the parties auscultated the baby every ten minutes after the fetal monitoring device was removed, as required by the standards of the American College of Obstetrics and Gynecology (ACOG) standards. Thus, the issue in this case is not whether the baby would have died from other causes even if the cesarean section had been performed faster, but rather the issue is whether the baby lost a chance of survival. Speculation about other possible contributing causes was irrelevant. In Hastings v. Baton Rouge Hospital, supra at 720 the court stated "... conjectures as to the likelihood of survival are inadmissible when a surgeon's negligent inaction has terminated any chance of survival." Similarly, where the nurses' negligent inaction has terminated any chance of survival, conjecture as to other possible causes of death is inadmissible. Accordingly, the trial court did not err when it excluded evidence of other possible causes of death and failed to submit interrogatories concerning other possible causes of death to the jury.

EXCLUSION OF EVIDENCE OF INSURANCE PAYMENTS
In its next assignment of error appellant argues that the court erred in admitting evidence of plaintiffs' medical expenses while excluding evidence of their payment and that the plaintiffs did not prove their claim for funeral expenses.
At the trial of the case, counsel for the plaintiffs questioned Mr. McCann about the medical expenses related to his son's birth. While questioning Mr. McCann, counsel showed Mr. McCann an exhibit of medical bills totalling $49,216.16 and asked if this was the correct total for the medical treatment of the baby. He did not formally request that the exhibit be introduced into the *873 record although opposing counsel had previously stated he wanted to have the exhibit introduced into the record. After the witness testified, a conference was held in the trial judge's chambers to discuss the fact that the bills contained insurance information. Counsel for the LPCF requested that the bills be shown to the jury and that he be allowed to cross-exam the witness about insurance coverage. The trial court allowed the plaintiff's counsel to remove all references to health insurance from the documents and to introduce a sanitized version of them into evidence. The plaintiffs argue that the bills in their original form were inadmissible under the collateral source rule and that the trial court correctly refused to permit the bills to be introduced into evidence, until the insurance information was deleted. The LPCF argues that the trial court erred in not allowing him to question the plaintiffs concerning payment by the insurance company because plaintiffs' counsel opened the door by having the plaintiff identify the bills and introducing them into evidence.
Pursuant to the "collateral source" rule the trial court correctly required that insurance information be deleted from the medical bills prior to allowing their admission. A tortfeasor may not benefit because of his victim's receipt of insurance payments from sources independent of the wrongdoer's contribution. Tumblin v. Gratech Corp., 448 So.2d 179, 182 (La.App. 4th Cir.1984). Since the plaintiffs' recovery is not diminished because of insurance benefits, it was not error to allow the submission of altered bills deleting reference to insurance payments. This assignment of error has no merit.

EVIDENCE OF FUNERAL EXPENSES
The record contains no indication that the defendant objected to the introduction of the funeral expenses bills when they were introduced in globo with the medical bills. Since the funeral expenses were part of the total expenses identified by the plaintiff, they are proven. This assignment of error has no merit.

DISQUALIFICATION OF PLAINTIFFS' COUNSEL
In its next assignment of error, appellant argues that the trial court erred in overruling the motion to disqualify plaintiffs' counsel.
One of the associates who worked in the firm representing the plaintiffs was Jean Farquharson. The trial court held an evidentiary hearing to determine whether plaintiffs' counsel should be disqualified because of a conflict of interest.
Mrs. Farquharson testified that she worked for Methodist Hospital from May 1, 1984, until she started working for Lawrence Smith and Associates (the firm representing the plaintiffs) on October 1, 1987. She worked for Lawrence Smith until April of 1991. The McCann baby was born at Methodist on June 13, 1984 and the formal petition for damages was filed on November 5, 1987. Prior to leaving Methodist, she met with her immediate supervisors to inform them that she would be going to work for a plaintiff's law firm that had two lawsuits against the Hospital. According to Ms. Farquharson, the administrators at Methodist Hospital knew she would never divulge any information that would be to the detriment of the hospital. This agreement with the Hospital was never reduced to writing. Ms. Farquharson testified that from the day she entered the firm it was "a known rule" that Methodist cases were off limits and not to be discussed in her presence. She was not to see anything about them. She was not to be present when documents were being produced or gone through about the cases. Methodist cases were simply off limits. She acknowledged that her signature was contained on a motion for extension of time to answer some discovery, but explained that she signed the extension by mistake. She signed it without knowing that it was Christopher McCann's case and she did not know the document had gone out until she received a phone call from one of the attorneys in the case. She never did any work on the McCann case. She never divulged any confidential information about the case that she had learned while she was counsel for Methodist.
*874 On cross examination Ms. Farquharson admitted that she was director of legal services for Methodist Hospital at the time the McCann incident occurred and that she investigated the incident in connection with the delivery of the McCann baby. She talked with Ms. McMullen, the nurse involved with the delivery. Her practice was to take handwritten notes of the interviews with the nurses. After the McCann incident, she probably was the person to collect the data and notes to send to outside counsel representing the Hospital.
Nurse McMullen, the nurse who was in the delivery room at the time of the delivery testified that after the delivery of the baby, she had conversations with Ms. Farquharson about what occurred during the time she was on duty with Ms. McCann since at the time, Ms. Farquharson was the attorney for the hospital. At the time she discussed the case with Ms. Farquharson, she believed that the information would be kept confidential.
After hearing all the evidence, the trial court stated:
The Court has heard numerous witnesses in this matter, experts, other lawyers who have opined on whether or not there have been violations of the Code of Professional Conduct.
While this Court feels that the action that was taken by Ms. Farquharson was no doubt inappropriate and probably borders on the appearance of an impropriety, this Court has heard no convincing evidence that:
Number one, she breached any confidence in this matter which would be to the detriment of Movers; Number two, that Pendleton Memorial, who was in fact the party that she worked for and was indeed employed by has seriously questioned any breach or violation of any confidential information, indeed, any information that might have been detrimental to the hospital.
While the Court realizes that Pendleton is only a nominal party in this matter, the Court has just had to weigh the veracity and the credibility of the witnesses who testified in this matter. Thus based upon the Court's assessment of the testimony, concern for the parties involved in this matter, the Motion to disqualify is denied and the matter will proceed with trial on Monday at 8:30. (emphasis added)
Rule 1.9 of the Rules of Professional Conduct prohibits a lawyer who has formerly represented a client in a matter from thereafter 1) representing another person in the same or a substantially related matter in which that person's interest are materially adverse to the interest of the former client unless the former client consents after consultation, or 2) using information relating to the representation to the disadvantage of the former client except as permitted by Rule 1.6.
Further Rule 1.10 entitled "Imputed Disqualification: General Rule" states:
(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(C), 1.9, or 2.2.
Based on Ms. Farquharson's own admissions, strict application of Rule 1.10 would have mandated disqualification of the firm of Lawrence Smith.
While the appearance of impropriety may be an issue to be raised with the disciplinary board for the State Bar Association, we agree with the trial judge that no evidence was introduced at the hearing to support a finding that Ms. Farquharson transmitted any confidential information to the plaintiffs, nor was any evidence submitted to support a finding that Methodist Hospital had any problems with the alleged conflict of interest situation. Moreover the evidence strongly supports a finding that Methodist implicitly waived the condition of disqualification per Rule 1.10(d).
Notwithstanding any violation of Rule 1.10 of the Rules of Professional Conduct; the LPCF failed to show that the alleged violation of Rule 1.10 prejudiced the hospital or the LPCF. The hospital settled and was no longer subject to any exposure at the time of trial. Moreover, given the fact that the motion to disqualify was filed on the eve of trial, we find that the trial court did not commit any manifest error when it refused to disqualify *875 the plaintiffs' attorney and denied appellant's request for a mistrial.

EXCESSIVENESS OF DAMAGES
In its final assignment of error, the LPCF argues that the jury abused its discretion by awarding the McCanns a total of $500,000.
The jury awarded the McCanns the following amounts:

 past medical expenses $ 50,000
 past mental and emotional pain and suffering $100,000
 future mental and emotional pain and
 suffering $50,000
 loss of love, affection and companionship:
 Vickilynn McCann $150,000
 Christopher McCann, III $150,000
 ________
 Total amount $500,000

The LPCF argues that the facts of this case warrant a total maximum award of no more than $150,000 for all damages to both parents. In support of this contention the LPCF notes that the McCann infant lived only 24 days, felt no pain in his irreversible coma, was clinically brain dead when he was only 24 hours old, and remained on life support systems for almost all of his short life. These facts, according to the LPCF prevented the parents from developing a lasting bond or establishing a normal relationship with the child. For these reason, LPCF argues the jury award of $150,000 for mental and emotional pain and suffering was excessive. We disagree.
The precise facts cited by the appellee explain why, given the circumstances of this case, the jury saw fit to award the McCanns $150,000. The fact that the infant felt no pain is irrelevant since the jury award is for the pain and suffering of the parents, not the child. In this regard, the record reveals that this was to be the McCanns' first baby and both were extremely excited over the prospect of the baby's birth. Mrs. McCann testified that she was in labor nearly 27 hours. When Dr. Merrill finally got the baby out, she knew something was wrong. The baby never cried. She stayed in the hospital five days. She called every day and asked how the baby was doing and asked if there was any hope for the baby, but the doctor told her there was no hope of the baby surviving. Despite the doctor's opinion, it took the McCanns some 24 days to accept the fact that the baby could not live and to make the difficult decision of removing the baby from the life support machines. The record is replete with evidence of the severe depression suffered by both of the McCanns after the baby's death. Mrs. McCann was naturally grief stricken by the loss and was unable to return to work for a couple of months. Additionally, it took a while for her to be able to hear the word "baby" without suffering from nervousness and depression. After the death of the baby, Mrs. McCann joined a self help group AMEND (Aiding Mothers Experiencing Neonatal Death).
Mr. McCann testified concerning his wife's depression over the baby's death. He also testified that he was present with his wife in the delivery room at the time of the baby's birth. He testified that Dr. Merrill appeared to be fumbling around when he pulled the baby out and the baby looked terrible. He was blue-gray. He watched as the pediatrician took over and started pushing on the baby's chest. He went along when the hospital personnel transported the baby to Baptist. While the baby was there he visited every day. Although Mr. McCann testified that he did not see a psychiatrist or psychologist after the baby's death, the effect of the baby's death was obviously as severe as the effect on Mrs. McCann. These facts demonstrate the severity of the mental and emotional pain suffered by the McCanns because of the loss of their first born child.
Appellant's argument that the birth of the McCanns two daughters helped mitigate the loss of the infant has little merit. While it is true that the McCanns subsequently had two daughters, the McCanns testified that the girls could not take the place of their lost son. Mrs. McCann had a tubal ligation after the third child because they felt they could only raise two children comfortably and she was going to be 35 and the doctor indicated that she was getting older and already had two kids. Mr. McCann testified that he thinks of the baby every time he goes to do woodworking.
The standard of appellate review of general damages awards was aptly given in Youn *876 v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993) when the court stated:
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck [v. Stevens, 373 So.2d 498 (La.1979)] to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
The numerous cases cited by the LPCF wherein parents who lost infant children and/or adult children were awarded smaller damage awards than the plaintiffs offer little support for the LPCF's contention that the jury abused its discretion and awarded excessive damages.
Again, in Youn v. Maritime Overseas Corp., supra., the court recognized the need for examining the particular effect of the injuries on the particular party to the litigation. The court expressed the importance of an individual assessment of each case when it succinctly stated:
In Reck [v. Stevens, 373 So.2d 498 (La. 1979)], this court disapproved the appellate court's simply reviewing the medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974).
Youn, supra at 1260-61.
Considering the effect that the death of their son had on the McCanns, we are unable to say that the jury abused its "much discretion". Pursuant to Youn, supra, this court has no authority to decrease the damage award of the jury.
Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.