668 So.2d 469 (1996)
Dora Boutte MERRITT, et al.
v.
Guler KARCIOGLU, M.D., et al.
Dora Boutte MERRITT, et al.
v.
ADMINISTRATORS OF the TULANE EDUCATIONAL FUND, et al.
Nos. 95-CA-1335, 95-CA-1336.
Court of Appeal of Louisiana, Fourth Circuit.
January 19, 1996.
Writ Denied April 26, 1996.
*471 Darleen M. Jacobs and James L. Yates, New Orleans, for Plaintiffs-Appellees Dora Boutte Merritt, et al.
Elaine W. Selle, Locke Purnell Rain Harrell, New Orleans, for Intervenor, Louisiana Patient's Compensation Fund.
Stewart E. Niles, Jr., Michelle A. Bourque, Jones, Walker, Waechter, Poitevent, Carrere *472 & Denegre, for Defendants/Appellants, The Administrators of the Tulane Educational Fund, d/b/a Tulane University Medical Center Hospital & Clinic, Guler Karcioglu, M.D., and Marcia Gsell, R.N. (formerly referred to as Marcia Wolff, R.N.).
Before BARRY, KLEES and WALTZER, JJ.
WALTZER, Judge.
Defendants Tulane University Medical Center (hereinafter "Tulane"), Dr. Guler Karcioglu and Marcia Wolff Gesell[1], R.N. appeal a judgment of the district court in conformity with a jury verdict awarding plaintiffs, the children of Amy Boutte, $555,000.00 damages for injuries sustained by Amy Boutte on October 10, 1988 while she was hospitalized at Tulane.
On October 7, 1988, Amy Boutte, a 92 year old female was admitted to the Emergency Room at Tulane with complaints of chest and stomach pain, epigastric pain, decreased appetite, nausea, vomiting and fever, which were eventually diagnosed as viral pneumonia.
At the time of her admission, Mrs. Bouttee had the following pre-existing conditions:
1. congestive heart failure with acute pulmonary edema;
2. hypertrophy cardiomyopathy;
3. pulmonary fibrosis or scarring of the lungs resulting from the lungs inability to expand sufficiently so as to allow her to breathe properly;
4. atrial tachycardia;
5. hyponatremia;
6. anemia;
7. peripheral vascular disease which caused gangrenous non-healing ulcers on her extremities because her heart was too weak to pump blood to the extremities;
8. arrhythmia or irregular heart beats;
9. mitral regurgitation and aortic insufficiency in which her dysfunctional heart valve, located between the two chambers of the heart allowed blood to leak back into the lungs, also causing congestion;
10. an aortic aneurysm or bulging of the largest blood vessel which required surgery, but surgery was contraindicated because her heart could not tolerate the stress.
Mrs. Boutte suffered from inoperable degenerative heart disease and had been hospitalized at Tulane eight times between 1979 and October 7, 1988. Five hospitalizations were between June 1987 and October 1988, including September 14, 1988 through September 21, 1988, when she was treated for congestive heart failure and acute pulmonary edema, two and one half weeks before the October 7th admission.
After admission Mrs. Boutte was stabilized. She was placed in the cardiac care unit where her heart and circulation were monitored with sensors and where her room had a window wall for observation. Her family was not allowed to stay with her.
On October 9 at 6:30 p.m., Mrs. Boutte complained to her family about going to the bathroom so frequently. The Nurses Progress Record states:
10-9 1830 (6:30 p.m.) Family at bedside. Patient very upset about going to bathroom so frequently. Requests family members to take her home.
On October 9 at 10:30 p.m., Mrs. Boutte got out of bed unassisted, despite warnings to the contrary. At the time, both side rails on her bed were in a raised position. The Nurses Progress Record states:
10-9 2230 (10:30 p.m.) Daughter called, advised patient. Vital signs stable. She got out of bed on her own. 2 Side rails up. Foot board on. Cautioned patient about getting out of bed.
At some time between midnight 10/9 and 3:30 a.m. 10/10[2], the Nurses Notes indicates:
*473 Becomes confused about place.
At 8:30 a.m. on October 10 Dr. Karcioglu reviewed the Nurses Notes and learned that Mrs. Boutte had left her bed unassisted despite the side rails and admonitions to the contrary. She visited Mrs. Boutte, who had been awake and sitting in a chair for an hour and who had already eaten breakfast. Based upon this waking assessment, Dr. Karcioglu decided not to order any restraints.
Four hours later the Nurses Progress Record indicates that at 12:30 p.m. on October 10:
Patient states she is in a room at her house. Patient reoriented to hospital and situation.
Six hours after she was seen by Dr. Karcioglu, the same document indicates at 1400 (2:00 p.m.):
Patient continues to state she is at home without prompting by family. Patient states `I know I'm in the hospital but for a minute I thought I was at home. Spoke with patient's daughter Marion about patient's confusion. Daughter says she understands.'
Approximately 7 hours after she was seen by Dr. Karcioglu, the Nurses Progress Record indicates at 1520 (3:20 p.m.):
Lying in bed supine with eyes closed. Arouses easily to verbal stimuli. Respiration even and unlabored Respiration = 24. Monitor shows sr with ectopy at this time. Hep lock flushed to right FA, dsj clean dry & intact. Lasix 40 mg Patient administered as ordered. Patient alert & oriented × 3, No ada this time. Patient temps noted.
Almost 7½ hours after she was seen by Dr. Karcioglu, the Nurses Progress Record indicates at 1550 (3:50 p.m.):
Patient lying on floor at foot of bed. Patient assisted back to bed per 3 RNs. Patient states "I've been trying to get out of bed. I tried this side [Right side], then I tried that side [Left side] and finally I decided to climb out down there. I thought the floor was right there. I was going to make some dessert for my family, in my kitchen." Patient reoriented to Time, Place & situation. Oxygen replaced, heart monitor reattached. Patient complains of Right leg pain. ecdymosis noted, patient complains of pain upon movement palpable. pedal pulses equal (= 2) Pollanard MD notified.
Mrs. Boutte fractured her right hip in the fall. The fracture was treated with an open reduction and internal fixation of the right hip. Postoperative physical therapy was given and Mrs. Boutte was discharged 10 days later at which time she was able to walk with a walker and assistance. She was re-examined on October 26, on November 16 and on November 29 at which time her fracture had healed and she was experiencing no pain. She was scheduled to return in 3 months, but did not make that appointment. On April 9, 1988, Mrs. Boutte was readmitted to Tulane for sepsis, decubitus ulcers, dehydration, renal failure, anemia, acute pulmonary edema and severe peripheral vascular disease with gangrene of the toes. On April 18, 1989, Mrs. Boutte died.
The children of Amy Boutte filed suit to recover for her injuries by a survival action, as well as to recover for their own loss of their mother by a wrongful death action. A jury trial was held, at the conclusion of which the jury answered the following interrogatories as follows:
1. Did plaintiffs establish the degree of knowledge of(sic) skill possessed or the degree of care ordinarily exercised by a physician practicing in the specialty of internal medicine? YES
2. Did plaintiffs prove by a preponderance of evidence that the care and treatment provided to Mrs. Amy Boutte by Dr. Guler Karcioglu fell below the standard of care required for a physician practicing in the specialty of internal medicine? YES
3. If YES, was the negligence of Dr. Guler Karcioglu a cause of the hip injury sustained by Mrs. Amy Boutte? YES

*474 4. If YES, was the negligence of Dr. Guler Karcioglu a cause of Mrs. Amy Boutte's death? NO
5. Did plaintiffs establish the degree of knowledge or skill possessed or the degree of care ordinarily exercised by a nurse in the same or similar circumstances? YES
6. Did plaintiffs prove by a preponderance of evidence that the care and treatment provided to Mrs. Amy Boutte by Marcia Wolff, R.N. fell below the standard of care required for a nurse? YES
7. If YES, was the negligence of Tulane Medical Center Hospital and Clinics through Marcia Wolff, R.N. a cause of the hip injury sustained by Mrs. Amy Boutte? YES
8. If YES, was the negligence of Tulane Medical Center Hospital and Clinic through Marcia Wolff, R.N. a cause of Mrs. Amy Boutte's death? NO
9. Was plaintiff Dora Boutte Merritt or Mrs. Amy Boutte negligent, and was either of their negligence a contributing cause of Mrs. Amy Boutte's hip injury? NO
10. Was (sic) plaintiffs Dora Boutte Merritt or Mrs. Amy Boutte negligent, and was either of their negligence a contributing cause of Mrs. Amy Boutte's death? NO
11. What percentage of fault, if any, do you attribute to the following:

Guler Karcioglu, M.D. 10%
Tulane Univ. Med. Ctr. Hospital 55%
Marcia Wolff, R.N. 35%
Mrs. Amy Boutte 0%
Dora Boutte Merritt 0%
 ____
 100%

12. What amount, in total, if any, expressed in a dollar amount, would you award to Mrs. Amy Boutte for the damages she suffered prior to her death as a result of any negligence stated. $555,000
13. What amount, if any, do you award to each of the survivors of Mrs. Amy Boutte for the damages they suffered as a result of the death of Mrs. Amy Boutte.

Herbert J. Boutte $210,000
Marion Boutte Smith $200,000
Dora Boutte Merritt $200,000

The trial court entered judgment in conformity with the jury verdict as follows:
After trial of this matter counsel for defendant renewed his exceptions and request for a directed verdict dismissing plaintiff's suit against one of the original defendant Dr. John Pollanard, and accordingly:
IT IS ORDERED, ADJUDGED AND DECREED that the motion for a directed verdict on behalf of defendant Dr. John Pollanard be and is hereby granted, and accordingly Dr. John Pollanard is hereby dismissed in this matter.
Considering the verdict of the Jury rendered herein in the form of interrogatories answered by them (a copy of which is attached) and the Court having considered the law and the evidence being in favor of the plaintiff, therefore:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiffs, Dora Boutte Merritt, Herbert J. Boutte and Marion Boutte Smith as surviving heirs of Amy Boutte and against defendants Guler Karcioglu, M.D., Tulane Medical Center Hospital and Marcia Wolff, R.N. in solido in the full sum of FIVE HUNDRED AND FIFTY-FIVE THOUSANDS (SIC) AND NO/100 ($555,000.00) DOLLARS with legal interest thereon from date of judicial demand until paid and all costs. The degree of fault in this judgment is set as follows:

Guler Karcioglu, M.D. 10%
Tulane University Medical Center 55%
Marcia Wolff, R.N. 35%

Judgment rendered on November 28, 1994.
Judgment read and signed on this the 5th day of December, 1994.
On January 13, 1995, the Louisiana Patient Compensation Fund (hereinafter "Fund") intervened. On February 13, 1995, defendants Tulane, Dr. Karcioglu and Nurse Wolff and the Fund appealed.
On appeal defendants Tulane, Dr. Karcioglu and Nurse Wolff raise the following assignments of error:

*475 1. The trial judge erred by failing to grant defendants' motions for mistrial based on various grounds, including plaintiffs counsel's testimony about her personal knowledge of Mrs. Boutte, and the prejudicial, inflammatory comments and behavior before the jury by both plaintiffs' counsel and the court.
2. The trial judge erred by failing to disclose the ongoing attorney/client relationship between the presiding trial judge and plaintiffs' counsel, which was independently discovered by counsel for defendants on the morning of trial.
3. The jury erred by finding that Dr. Karcioglu failed to comply with the prevailing standard of care for an internist because plaintiffs introduced no expert testimony or evidence that any alleged negligence by Dr. Karcioglu caused Mrs. Boutte's broken hip.
4. The jury erred by finding that Ms. Wolff, R.N., failed to comply with the prevailing standard of care for a critical care nurse because plaintiffs failed to prove the standard of care for a nurse, or that any alleged negligence by Ms. Wolff caused Mrs. Boutte's broken hip.
5. The jury erred by allocating fault to Tulane Medical Center Hospital because plaintiffs introduced no expert testimony that proved the standard of care for a hospital, that Tulane Medical Center employees breached the standard of care for a hospital, or that any independent negligence by Tulane Medical Center employees caused Mrs. Boutte's broken hip.
6. The jury erred by awarding plaintiffs $555,000.00 in general damages because $555,000.00 for a chronically ill 92 year old woman's broken hip is grossly excessive when her recovery was complete in 61/2 weeks and the jury found the "defendants' negligence" was not a contributing cause of her death.
7. The trial judge erred by failing to limit the damages award to $500,000.00 because the jury's verdict contains no finding the Mrs. Boutte was in need of "future medical care" or "the amount thereof".
8. The trial judge erred by failing to include language in the Judgment limiting defendants' liability to $100,000.00, plus interest accruing after April 1, 1991.
The Fund raises the following issues on appeal:
1. The trial court erred by finding that Dr. Karcioglu failed to comply with the prevailing standard of care for an internist because plaintiffs introduced no expert testimony or evidence that any alleged negligence by Dr. Karcioglu caused Mrs. Boutte's broken hip.
2. The trial court erred in finding that Tulane was negligent in the absence of any evidence adduced at trial to prove this independent finding.
3. The trial court erred by finding that Ms. Wolff, R.N., failed to comply with the prevailing standard of care for a critical care nurse because plaintiffs failed to prove the standard of care for a nurse, or that any alleged negligence by Ms. Wolff caused Mrs. Boutte's broken hip.
4. The trial court erred by awarding plaintiffs $555,000.00 in general damages because $555,000.00 for a chronically ill 92 year old woman's broken hip is grossly excessive when her recovery was complete in 6½ weeks and the jury found the "defendants' negligence" was not a contributing cause of her death.
5. The trial court erred by failing to limit the damage award to $500,000.00 because the jury's verdict contains no finding the Mrs. Boutte was in need of "future medical care" or "the amount thereof", pursuant to LSA-R.S. 40:1299.42(B)(1).

ASSIGNMENT ONE
The trial judge erred by failing to grant defendants' motions for mistrial based on various grounds, including plaintiffs counsel's testimony about her personal knowledge of Mrs. Boutte, and the prejudicial inflammatory comments and behavior before the jury by both plaintiffs' counsel and the court.
During opening statements, plaintiffs' counsel made the following remark:
Mrs. Boutte was a wonderful member of the community. She was well known to me. I also serve on the board of directors *476 for the LaFon Nursing Home, which she also served on. And she was just a wonderful person, and I join with my clients in mourning her loss.
Defendants argue that "(p)ursuant to the Rules of Professional Conduct, it is unethical and in contempt of court for an attorney to assert personal knowledge of the facts in issue, except when testifying as a witness. Rules of Professional Conduct, LSA-R.S. 37:Rule 3.4(e) (emphasis added)."
Rule 3.4(e) provides:
A lawyer shall not:
(e) In trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused; [Emphasis added].
The statement made by plaintiffs' counsel did not go to contested facts, but rather went to the character and credibility of Mrs. Boutte. Mrs. Boutte was not called as a witness and could not have been because she was deceased. We find that plaintiffs' counsel's comment was at most harmless error and at least not contemplated by the statute because Mrs. Boutte was not a witness.
As to "the prejudicial, inflammatory comments and behavior before the jury", we note that both plaintiffs' counsel and defense counsel are highly successful members of their respective fields, due in no small part to the highly aggressive and highly vocal style of litigation shared by both. We find that plaintiffs' counsel and defense counsel were ably matched and that each was well able to hold his or her ground with the other. Accordingly, we find that this assignment of error is without merit.

ASSIGNMENT TWO
The trial judge erred by failing to disclose the ongoing attorney/client relationship between the presiding trial judge and plaintiffs' counsel, which was independently discovered by counsel for defendants on the morning of trial.
Of much greater concern is defendants' assignment that the trial judge failed to disclose his ongoing attorney/client relationship with plaintiffs' counsel to the defense.
On April 7, 1994, counsel for plaintiffs herein filed the matter entitled "Louis DiRosa, Sr. and Leslie DiRosa v. Connie Grass, Allstate Insurance Company and State Farm Insurance Company," No. 94-5151 on the Civil District Court docket. Defendants twice requested continuances of the trial date, on September 2, 1994 and on November 2, 1994. Contradictory hearings were held on both motions and on neither occasion did either the trial judge or opposing counsel disclose the current, on-going employment relationship.
LSA-C.C.P. art. 151(B)(2) provides:
B. A judge of any court, trial or appellate, may be recused when he
(2) At the time of hearing of any contested issue in the case, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney's firm), and in this case the employment shall be disclosed to each party in the cause; [Emphasis added].
The Code of Judicial Conduct, Canon 5(C)(1) provides:
C. Financial Activities
(1) A judge should refrain from financial and business dealings that tend to reflect adversely on the judge's impartiality, interfere with the proper performance of judicial duties, exploit the judge's judicial position, or involve the judge in frequent transactions with lawyers or persons likely to come before the court on which he or she serves. [Emphasis added].
Initially we note that LSA-C.C.P. art. 151(B)(2) provides "the employment shall be disclosed to each party in the cause", but does not state who has the duty to disclose.
Code of Judicial Conduct Canon 2(B) provides:

*477 B. A judge should not allow family, social, or other relationships to influence judicial conduct or judgment. A judge should not lend the prestige of judicial office to advance the private interest of others; nor should a judge convey or permit others to convey the impression that they are in a special position to influence the judge ...
Reading LSA-C.C.P. art. 151(B)(2) in conjunction with Code of Judicial Conduct Canon 5(C)(1) and Canon 2(B), we find that the judge has a separate, distinct and individual duty to disclose "at the time of hearing of any contested issue in the case, (that he) has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney's firm)".
Turning to the duty of an attorney employed by a judge, we note the following:
Rule of Professional Conduct 1.2 provides:
(a) Both lawyer and client have authority and responsibility in the objectives and means of representation ... [Emphasis added].
Rule of Professional Conduct 3.3 provides:
(a) A lawyer shall not knowingly:
(2) Conceal or knowingly fail to disclose that which he is required by law to reveal ... [Emphasis added].
Rule of Professional Conduct 3.4 provides:
A lawyer shall not:
(c) Knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on assertion that no valid obligation exists; [Emphasis added].
Rule of Professional Conduct 8.4 provides:
It is professional misconduct for a lawyer to:
(f) Knowingly assist a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law; [Emphasis added].
Reading LSA-C.C.P. art. 151(B)(2) in conjunction with Rules of Professional Conduct 1.2(a), 3.3(a)(2), 3.4(c), and 8.4(f), we find that the "attorney actually handling the cause (not just a member of that attorney's firm)" has a separate, distinct and individual duty to disclose "at the time of hearing of any contested issue in the case, (that he) has continued to (be) employ(ed), to represent (the judge) personally." Thus both the judge and the attorney representing him each have a separate and independent duty to disclose the employment relationship to all parties. Because the statute says "shall disclose" the duty to disclose is mandatory.
In the instant case, there were two contradictory hearings held during which no disclosures were made. The third occasion was the trial. On the morning of trial defense counsel independently discovered the attorney/client relationship between the trial court judge and plaintiffs counsel. Defense counsel, however, decided not to file a motion to recuse the trial court judge under LSA-C.C.P. art. 151(B)(2). When counsel decided not to file a motion to recuse, he waived his rights under LSA-C.C.P. art. 151. Accordingly, this assignment of error is without merit.

ASSIGNMENT THREE
The jury erred by finding that Dr. Karcioglu failed to comply with the prevailing standard of care for an internist because plaintiffs introduced no expert testimony or evidence that any alleged negligence by Dr. Karcioglu caused Mrs. Boutte's broken hip.
On appeal, this court is required to review findings of fact under the manifest error rule. Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978) on remand 370 So.2d 1262 (La.App. 3 Cir.1979) writ denied 374 So.2d 660 (La.1979); Rosell v. ESCO, 549 So.2d 840 (La.1989) on remand 558 So.2d 1360 (La.App. 4 Cir.1990) writ denied 561 So.2d 105 (La.1990); Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert. denied ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379.
None of the medical experts found that Dr. Karcioglu had breached the standard of care by not ordering restraints. Expert opinions are persuasive, but are not controlling. Moore v. Healthcare Elmwood, Inc., 582 So.2d 871 (La.App. 5 Cir.1991). In the instant case, the jury apparently found *478 that Dr. Karcioglu should have ordered restraints. The jury is entitled to find liability when "the alleged act is one from which a lay person can infer negligence based upon common knowledge." McCann v. ABC Insurance Co., 93-1789 (La.App. 4 Cir. 7/14/94), 640 So.2d 865. Dr. Karcioglu evaluated Mrs. Boutte in the early morning after a somewhat good night's sleep and after she had a bath and breakfast. In short, Dr. Karcioglu saw plaintiff when she was at her best. At the time that Dr. Karcioglu made her decision, there had already been one instance of getting out of bed unassisted and one instance of confusion. We cannot conclude that the jury was manifestly erroneous in its determination that Dr. Karcioglu should have ordered restraints. Accordingly, this assignment is without merit.

ASSIGNMENT FOUR
The jury erred by finding that Ms. Wolff, R.N., failed to comply with the prevailing standard of care for a critical care nurse because plaintiffs failed to prove the standard of care for a nurse, or that any alleged negligence by Ms. Wolff caused Mrs. Boutte's broken hip.
In the instant case the jury apparently found that Ms. Wolff should have notified Dr. Karcioglu or any of plaintiff's other physicians at 12:30 p.m. and 2:00 p.m., when Mrs. Boutte became confused. As previously discussed, the jury is entitled to find liability when "the alleged act is one from which a lay person can infer negligence based upon common knowledge." McCann v. ABC Insurance Co., above, 640 So.2d at 870. We cannot conclude that the jury was manifestly erroneous in this determination. Accordingly, this assignment is without merit.

ASSIGNMENT FIVE
The jury erred by allocating fault to Tulane Medical Center Hospital because plaintiffs introduced no expert testimony that proved the standard of care for a hospital, that Tulane Medical Center employees breached the standard of care for a hospital, or that any independent negligence by Tulane Medical Center employees caused Mrs. Boutte's broken hip.
Nurse Wolff was assigned exclusively to Mrs. Boutte on the day of the injury. She checked plaintiff's vital signs at 3:30 p.m. and found plaintiff on the floor at 3:50 p.m. In the intervening 20 minutes, Nurse Wolff left Mrs. Boutte's room in order to respond to an emergency code in another patient's room. Although she was assigned to Mrs. Boutte, she was required to respond by Tulane policy. On the day in question there were 6 critical care patients on the ward, but only 4 nurses, one of whom was there strictly for observation, such that there were only 3 active nurses for the six patients. Accordingly, the jury could have concluded that Tulane was negligent in understaffing the ward and in requiring Nurse Wolff to be in two places at the same time, i.e. watching Mrs. Boutte and being with the code patient. Accordingly, we cannot conclude that the jury was manifestly erroneous. This assignment is without merit.

ASSIGNMENT SIX
The jury erred by awarding plaintiffs $555,000.00 in general damages because $555,000.00 for a chronically ill 92 year old woman's broken hip is grossly excessive when her recovery was complete in 61/2 weeks and the jury found the "defendants' negligence" was not a contributing cause of her death.
In Youn v. Maritime Overseas Corp., above, the Louisiana Supreme Court stated:
[1] In Reck v. Stevens, 373 So.2d 498 (La.1979), this Court commented on appellate review of general damage awards and on the "much discretion" in fixing damages accorded to trial courts by La.Civ.Code art. 1934(3) (1870). (FN2) The decision pointed out that the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration.
[2] In Reck, this court disapproved the appellate court's simply reviewing the *479 medical evidence and then concluding that the award for those injuries was excessive, without taking into consideration the particular effect of the particular injuries on the particular plaintiff. This court further disapproved of the use of a scale of prior awards in cases with generically similar medical injuries to determine whether the particular trier of fact abused its discretion in the awards to the particular plaintiff under the facts and circumstances peculiar to the particular case. The initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the "much discretion" of the trier of fact. Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963); Ballard v. National Indem. Co. of Omaha, Neb., 246 La. 963, 169 So.2d 64 (1964); Lomenick v. Schoeffler, 250 La. 959, 200 So.2d 127 (1967). Only after such a determination of an abuse of discretion is a resort to prior awards appropriate and then for the purpose of determining the highest or lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976); Bitoun v. Landry, 302 So.2d 278 (La.1974); Spillers v. Montgomery Ward & Co., 294 So.2d 803 (La.1974). [623 So.2d at 1260-1261].
[3] The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award. Nevertheless, the theme that emerges from Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149 (1963) through Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), and through Reck to the present case is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Under the standards of Youn, above, this court cannot first look to the range of other similar awards in order to determine if a clear abuse of the great, even vast discretion of the trier fact has occurred in the amount of damages awarded. As stated by the court in Youn, above, the standard is "non-specific". Plaintiff presented evidence that prior to Mrs. Boutte's hip injury she was a physically active individual, whereas afterwards she was severely limited in her activities. In contrast, defendants presented evidence that Mrs. Boutte was returned to the same physical condition that she had prior to the injury as of November 29, 1988, approximately 6 months prior to her death. Assuming that the jury found in accordance with plaintiffs' evidence, the particular effect of the particular injuries on the particular plaintiff in the instant case are a diminution of the quality of life for the last seven months of her life. Is the diminution of the quality of life for the last seven months of one's life worth $500,000.00? Apparently the jury in the instant case found so. While this court may not agree with the amount awarded, under the "non-specific" standard of Youn and the admonitions of the Supreme Court not to examine the range of similar awards initially and not to substitute our judgment for the great, even vast discretion of the trier of fact, we cannot find that a clear abuse of discretion occurred under Youn.

ASSIGNMENT SEVEN
The trial court erred by failing to limit the damage award to $500,000.00 because the jury's verdict contains no finding that Mrs. Boutte was in need of "future medical care" or "the amount thereof", pursuant to LSA-R.S. 40:1299.42(B)(1).
LSA-R.S. 40:1299.42(B)(1) provides:
B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five *480 hundred thousand dollars plus interest and cost.
LSA-R.S. 40:1299.43 provides in part:
A. (1) In all malpractice claims filed with the board which proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits and the amount thereof.
* * * * * *
B. (1) "Future medical care and related benefits" for the purpose of this Section means all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services, after the date of the injury. [Emphasis added].
Plaintiff argues that the special interrogatory is not issued by plaintiffs' request, but is required by law. We agree that it is not the duty of the plaintiff to request the special interrogatory, rather it is the duty of the trial judge. Where the trial judge forgets to give the special interrogatory, however, it is the duty of the plaintiff to object thereto in order to give the trial judge the opportunity to correct his error. In the instant case, written interrogatories were prepared and given to the jury. After the jury was sent to deliberate, both plaintiff and defense counsel noted their objections for the record. Plaintiffs' counsel stated:
Yes, Judge, I want to put some objections on the record. We would object to the failure of the Court to give the following charges of plaintiff: Jury Charge Number 3, which is Aggravation of Pre-existing Condition; Jury Charge Number 4, which is res ipsa Loquitur; Jury Charge Number 6, which is Duty of Hospital; Jury Charge Number 8, which is Duty of Nurse; Jury Charge Number 9, which is Damages: Elements, and Nature and Extent of Liability; Jury Charge number 10, which is DamagesGeneral Rule; Jury Charge Number 11, which is Respondeat Superior/Vicarious Liability: Jury Charge Number 13, which is Nurses' Negligence: Jury Charge Number 14, which is Nurses' Negligence: Jury Charge Number 15, which is Hospital's Duty to Protect a Plaintiff; Jury Charge Number 18, which is Aggravation of Pre-existing Condition Injury.
And on the Supplemental Suggested Jury Charges, the failure of the Court to give Jury Charge Number 20, which is Cause of Death; Jury Charge Number 23, which is the Inclusiveness of the Evidence; Jury Charge Number 24, which is Burden of Proof; and Jury Charge Number 26, which is Duty of Physician.
And we would like in connection with our objections to offer, introduce, and file into evidence, although outside the presence of the jury, a copy of the Plaintiff's Suggested Jury Charges and Plaintiff's First Supplemental and Amending Jury Charges, marking same P-19 for purposes of identification.
We would then further object to the Court's inclusion in this final charge to the jury of plaintiffsof defendant's in Jury Charges 1 through 27. And we object to Jury Interrogatories Number 12 and 13, as there has been no evidence to show that either Mrs. Amy Boutte or Dora Merritt or any of the other plaintiffs did anything to cause the injury or death of Amy Boutte.
A review of the jury charges objected to by plaintiff indicates that none of them address the special interrogatory issue. Accordingly, we find that plaintiffs' total recovery is limited to $500,000.00 and we will amend the judgment to so reflect.

ASSIGNMENT EIGHT
The trial judge erred by failing to include language in the Judgment limiting defendants' liability to $100,000.00, plus interest accruing after April 1, 1991.
In Turner v. Massiah, 94-2548 (La. 6/16/95), 656 So.2d 636, the court stated:
The statute limits both recovery and liability... The $100,000 cap on liability of a health care provider applies to "injuries to or death of any one patient." La.R.S. 40:1299.42(B)(2). For one patient and one injury there is but one cap.
*481 Accordingly, we agree that the trial judge erred and will amend the judgment to so reflect.

INTEREST & COSTS
At the close of the trial, there was some discussion about interest. Only counsel for the defendants mentioned anything about interest in his brief. Accordingly, this issue was abandoned by the other parties. No one mentioned costs as an issue.
For the reasons discussed, the judgment of the trial court is amended as follows and, as amended, is affirmed:
After trial of this matter counsel for defendant renewed his exceptions and request for a directed verdict dismissing plaintiff's suit against one of the original defendant Dr. John Pollanard, and accordingly:
IT IS ORDERED, ADJUDGED AND DECREED that the motion for a directed verdict on behalf of defendant Dr. John Pollanard be and is hereby granted, and accordingly Dr. John Pollanard is hereby dismissed in this matter.
Considering the verdict of the Jury rendered herein in the form of interrogatories answered by them (a copy of which is attached) and the Court having considered the law and the evidence being in favor of the plaintiff, therefore:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiffs, Dora Boutte Merritt, Herbert J. Boutte and Marion Boutte Smith as surviving heirs of Amy Boutte and against defendants Guler Karcioglu, M.D., Tulane Medical Center Hospital and Marcia Wolff, R.N. in solido in the full sum of FIVE HUNDRED THOUSAND AND NO/100 ($500,000.00) DOLLARS with legal interest thereon from date of judicial demand until paid and all costs, to be paid as follows:
By Defendants Guler Karcioglu, M.D., Tulane Medical Center Hospital and Marcia Wolff, R.N. in solido in the full sum of ONE HUNDRED THOUSAND AND NO/100 ($100,000.00) DOLLARS plus interest accruing thereon from April 1, 1991.
By the Louisiana Patient's Compensation Fund, all amounts awarded in excess of that paid by Defendants Guler Karcioglu, M.D., Tulane Medical Center Hospital and Marcia Wolff, R.N.. The degree of fault in this judgment is set as follows:

Guler Karcioglu, M.D. 10%
Tulane University Medical Center 55%
Marcia Wolff, R.N. 35%

Judgment rendered on November 28, 1994.
Judgment read and signed on this the 5th day of December, 1994.
AMENDED AND AFFIRMED.
KLEES, Judge, concurring.
Considering the pre-existing condition of 92 year old decedent Amy Boutte, and the fact that the fracture to her hip had healed and she was experiencing no pain approximately six weeks after her injury, the quantum award appears to me to be disproportionate to the injuries sustained. Nonetheless, our Supreme Court has made it abundantly clear that the discretion vested in the trier of fact is "great", and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993) cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379.
Accordingly, I respectfully concur in the judgment herein.
BARRY, Judge, dissenting with reasons.
A review of the transcript establishes a clarion call that the judgment should be reversed and/or remanded and re-allotted for a new trial.

QUANTUM
The facts are not complicated. Mrs. Boutte, 92 years old, apparently climbed over a raised side rail on her Tulane Medical Center bed, fell, and fractured a hip. The fracture was surgically repaired and she was discharged from the hospital ten days later. Within seven weeks the fracture had healed and pain was minimal. She did not return for a scheduled appointment three months later.
*482 Mrs. Boutte's physical condition was poor, at best, prior to her fall. She had numerous serious physical problems which caused her admission to the hospital. Seven months after the fall Mrs. Boutte died from pulmonary edema, renal failure, vascular disease, and other ailments. The hip fracture was not related to her death. General damages of $555,000 were awarded.
The trial court's "much" discretion as to general damages is "great" and "vast". Youn v. Maritime Overseas Corp.[1] It is redundant to acknowledge that appellate courts are very cognizant that quantum should rarely be disturbed.
"[E]ach case is different", and an "award should be determined by the facts or circumstances particular to the case under consideration." Id. at 1260, citing Reck v. Stevens, 373 So.2d 498 (La.1979). Appellate courts should consider the "particular effect of the particular injuries on the particular plaintiff." Id. The standard for appellate review of general damage awards is "necessarily non-specific", and can be modified only when the award is "beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances...." Id. at 1261.
The majority "assumes" the jury found that Mrs. Boutte was limited in her activities during the seven months prior to her death, then summarily concludes that the "non-specific" standard of Youn justifies the $555,000 award. I respectfully disagree.
The injury and effect of this particular injury on this particular plaintiff are not difficult to evaluate. Mrs. Boutte, 92 years old, was chronically ill when admitted to the hospital. She walked with a four prong hand cane. Mrs. Boutte's fractured hip was surgically repaired, recovery was uneventful, and she was discharged seven weeks later. There is no evidence that Mrs. Boutte suffered pain beyond the six to seven weeks of medical treatment. Mrs. Boutte had a remarkable recovery and did not keep a follow-up doctor's appointment three months later. There was no claim for future medicals. She was ambulatory with a four prong walker at the time of her death.
The jurisprudence on quantum cited in the briefs is not similar to Mrs. Boutte's damages. I did not locate a case which involves a chronically ill 92 year old who falls out of a hospital bed, fractures a hip, and recovers within seven weeks.
After a review of the record, and following Youn, I conclude that the $555,000 award is far beyond that which a reasonable trier of fact would assess.
I disagree with several statements and other conclusions by the majority.

Failure to Disclose Judge/Attorney Relationship
It is uncontroverted that plaintiffs' counsel represented the trial judge for several months before trial and during two contradictory hearings prior to trial. Neither disclosed their "on-going employment relationship." La.C.C.P. art. 151(B)(2) provides that the judge of any court:
At the time of hearing of any contested issue in the cause, has continued to employ, to represent him personally, the attorney actually handling the cause (not just a member of that attorney's firm), and in this case the employment shall be disclosed to each party in the cause. [emphasis added]
Assignments 1 & 2 concern the mandatory obligation that the trial judge and plaintiffs' counsel had to advise opposing counsel of their attorney/client relationship. The majority correctly states: "Of much greater concern is defendants' assignment that the trial judge failed to disclose his ongoing attorney/client relationship with plaintiffs' counsel." Of equal concern is that plaintiffs' counsel did not disclose.
The majority agrees that the trial judge had a "distinct and individual duty" to disclose. Defendants' counsel learned of the judge/attorney relationship from a member of his law firm the morning of trial. Whether to file a motion to recuse a judge is an agonizing decision for any trial attorney.
*483 Plaintiffs' counsel also had a duty to disclose "at the outset" that she represented the trial judge. Rules of Professional Conduct, Rules 1.2, 3.3, 3.4 and 8.4. The majority resolves both violations: "When [defense] counsel decided not to file a motion to recuse, he waived his rights under LSA-C.C.P. art. 151." I disagree. The defense was entitled to a fair trial and the ongoing relationship between the trial judge and plaintiffs' counsel, ipso facto, precluded a level playing field. Once the statute and professional conduct rule came into play (when this matter was allotted) the duty to disclose was on the trial judge and plaintiffs' counsel. There is no statutory or jurisprudential basis to shift the responsibility as to their conflict of interests.
Both wrongs cannot be "waived."

FAIR TRIAL
Defendants' counsel cites instances when the trial judge commented on testimony in a way that favored the plaintiffs. There are instances when plaintiffs' counsel objected to a question, then was permitted to comment on the objection in the presence of the jury. Comments to the jury by plaintiffs' counsel as to her personal friendship with Mrs. Boutte are questionable. Whether plaintiffs' counsel and defendants' counsel were "equally matched" (as the majority states) does not resolve allegations of "prejudicial, inflammatory comments and behavior before the jury." The issue is whether the trial was tainted. The majority does not address that issue.
Assignment of Error 3 points out that no expert testified that Dr. Karcioglu breached the standard of medical care. The majority concludes that the jury "apparently found that Dr. Karcioglu should have ordered restraints". Pfiffner v. Correa, 643 So.2d 1228 (La.1994) states that expert testimony is not required when negligence is obvious to a lay person, i.e. a sponge left in the body, a patient who bled to death. However, whether restraints should have been used on Mrs. Boutte (considering her fragile condition and age) is a critical issue that requires expert testimony absent which Dr. Karcioglu may not be negligent. Pfiffner is not applicable.
In summary, the standard of care or a breach thereof by Dr. Karcioglu was not established.
Assignment of Error 4 claims out that there was insufficient testimony concerning the standard of care which was allegedly breached by Nurse Wolff.
The Medical Review Panel did not have jurisdiction to decide whether the hospital or nurse was negligent.
Assignment of Error 5 correctly argues that there was no testimony that Tulane Medical Center was negligent due to understaffing which necessitated Nurse Wolff to be in another place at the time of Mrs. Boutte's fall.
The judgment should be reversed and/or remanded and re-allotted for a new trial.
NOTES
[1] During the course of the litigation Nurse Wolff married. Her married name is spelled in the record as both Gesell and Gsell.
[2] The portion of the photocopy showing the exact hour is cut off. Under the time column, only the last two digits "30" are visible. Further down the page, however, the digits 330 are visible. Because the hospital uses a 24 hour clock, we know that 330 is 3:30 a.m. The last entry on the prior page is the last entry for 10/9 because each day at midnight a new sheet is started. Thus we know that this entry is sometime between midnight 10/9 and 3:30 a.m. 10/10.
[1] 623 So.2d 1257 (La.1993) cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379.