696 So.2d 257 (1997)
Mary M. COSCINO
v.
Darrell E. WOLFLEY, M.D., et al.
No. 96-CA-0702.
Court of Appeal of Louisiana, Fourth Circuit.
June 4, 1997.
*259 Joseph F. Bishop, Jr., Garcia & Bishop, Metairie, for Appellee.
Richard Ieyoub, Attoney General, Mack E. Barham, Robert E. Arceneaux, Jerry B. Jordan, Barham & Arceneaux, New Orleans, for Appellants.
Before LOBRANO, ARMSTRONG and LANDRIEU, JJ.
LANDRIEU, Judge.
This case stems from a medical malpractice claim which alleged a lack of informed consent. The plaintiff was awarded general damages and medical expenses.

FACTS
Mary Coscino developed bulging eyes as a result of having Graves disease. Due to the protrusion of her eyes, she began to experience dryness of her eyes at night because she could not close her lids. She consulted Dr. Darrell Wolfley, an ophthalmologist, in May of 1989 who initially advised her to use Dura Tears and tape her eyes shut at night. This treatment was only minimally effective, so in order to relieve her symptoms and produce a more "normal" appearance, she and Dr. Wolfley discussed various other treatments, including orbital decompression surgery which Ms. Coscino elected to have. Dr. Wolfley treated her for about six months prior to her surgery to stabilize her thyroid condition.
On January 10, 1990, Dr. Wolfley performed the orbital decompression surgery on Ms. Coscino. Shortly afterwards, Ms. Coscino developed a cranial spinal fluid (CSF) leak which spontaneously stopped after a few days. About ten days later, when the CSF leak resumed, Ms. Coscino saw Dr. Roger Smith, a neurosurgeon at LSU. Ms. Coscino was hospitalized and had a spinal catheter inserted to halt the leak. This treatment was only temporarily successful.
When the leak again resumed, Ms. Coscino consulted with another neurosurgeon, Dr. Joseph Kott. He performed a craniotomy to repair a tear in the dura which was the cause of the CSF leak. As a result of the craniotomy, she experiences a diminished sense of taste and smell, phantom smells, and occasional double vision.
Ms. Coscino sued Dr. Wolfley alleging that he had failed to obtain her informed consent. A medical review panel determined that there were issues of material fact involving the informed consent. A trial judge ruled in Ms. Coscino's favor and awarded general damages of $450,000.00 and medical expenses of $40,717.72.
Dr. Wolfley and the Louisiana Department of Health and Hospitals appeal asserting that the trial court committed legal error by:
(1) Ignoring, limiting, and excluding expert testimony which established that the degree of harm of a CSF leak was de minimis;

(2) Not allowing them to introduce evidence as to the method and practice of Dr. Wolfley and the LSU Eye Clinic in obtaining informed consent;
(3) Limiting cross-examination of Ms. Coscino as to her deposition testimony about whether she would have elected the orbital decompression surgery knowing a CSF leak *260 was possible and a craniotomy might have been necessary to repair it;
(4) Not applying an objective standard of causation when determining whether Ms. Coscino would have elected to have an orbital decompression surgery had she known of the risk of a CSF leak and a subsequent craniotomy; and
(5) Awarding excessive damages.

DISCUSSION
The Louisiana Uniform Consent Act in effect at the time of Ms. Coscino's surgery[1] required a patient's written consent which:
(a) [S]ets forth in general terms the nature and the purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed.... Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
La.Rev.Stat. 40:1299.40(A).
In a trial claiming inadequate disclosure of risk information by a physician, the patient must establish, prima facie, the essential elements of the cause of action, i.e. that the undisclosed risk actually occurred and had the risk been disclosed, the treatment would have been avoided. LaCaze v. Collier, 434 So.2d 1039 (La.1983). A remote, minor, or insignificant risk does not create a jury question, but when a material risk which would have influenced a reasonable person is proven, it must then be shown that the treating physician breached a duty to disclose that risk. Hondroulis v. Schuhmacher, 553 So.2d 398, 405 (La.1988).

ASSIGNMENT OF ERROR NO. 1
Dr. Wolfley argues that the trial court committed legal error and abused its discretion when it ignored, limited, and excluded expert evidence which established that a CSF leak was a de minimis risk of the surgery performed. The nature of the risk was a factual determination and must be reviewed under the manifest error rule. Stobart v. State through Dept. Transp. and Development, 617 So.2d 880, 882 (La.1993).
The physician is required to disclose all risks which are "material." LaCaze, 434 So.2d at 1045-46. A risk is material when a reasonable person, in what the doctor knows or should know to be the patient's position, would likely attach significance to the risk or cluster of risks in deciding whether to forego the proposed therapy. Hondroulis, 553 So.2d at 412, citing Canterbury v. Spence, 464 F.2d 772 (D.C.Cir.1972), cert. denied, sub nom., 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972). Hondroulis set the standard for determining medical risk as follows:
The factors contributing significance to a medical risk are the incidence of injury and the degree of harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small.
The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risks exist and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the *261 specific risk. This determination of materiality does not require expert testimony.
Hondroulis, 553 So.2d at 412.
The trial court, in deciding whether the risk of a possible CSF leak was de minimis as the appellants argue, or "material" as Ms. Coscino asserts, must apply the standard set forth in Hondroulis. The first step in the inquiry is determining the incidence of injury and the degree of harm threatened. Dr. Wolfley argues that the expert testimony set the rate of a CSF leak occurring as a result of an orbital decompression surgery at less than 1%. However, the cumulative expert testimony set a range for the rate of occurrence from less than 1% to a high of 3.5%. These latter percentages were the figures relied upon by the trial court in determining the incidence of the risk.
The next step is to determine the degree of the harm threatened by the risk. Dr. Richard Hesse, an ophthalmologist, testified that a CSF leak is a known complication of orbital decompression surgery which is documented in medical literature. He also testified that a CSF leak can lead to further serious complications such as meningitis. He stated that if conservative measures do not spontaneously stop a CSF leak, surgery would be required and could involve a craniotomy. Dr. Wolfley asserts that the trial court stopped him from questioning Dr. Hesse about the degree of harm. We disagree. First, Dr. Hesse had already testified as to the degree of harm. Second, the trial court allowed Dr. Wolfley's line of questioning by instructing Dr. Hesse that "I don't know if you can answer that, but if you can I will let you." Dr. Hesse responded that the degree of harm varied with the specifics of each case and ranged from spontaneous correction to a neurological procedure for repair.
Dr. Kott, who had performed the craniotomy, testified that a CSF leak is a serious matter because it can result in meningitis, a cerebral abscess, or pneumocephalus[2]. He stated that intragenic leaks, which occur after surgery on the skull, do not usually correct themselves and require surgical intervention. He said that the particular location of the dura tear that caused the leak Ms. Coscino experienced could only have been repaired by means of a craniotomy.
Dr. Thomas Charles Trevorrow, an ophthalmologist, testified that he had heard of the possibility of a CSF leak in connection with the surgery that Ms. Coscino experienced, but had never heard of a craniotomy being performed to correct a CSF leak.
Dr. Sieon Lauer, an ophthalmologist, testified that it was possible for an orbital decompression surgery to lead to a CSF leak requiring a craniotomy, but such an occurrence would be very uncommon.
Dr. Larry Stewart, an ophthalmologist, testified that a CSF leak is a well-known complication of an orbital decompression surgery and a craniotomy can be a consequence of such a leak.
Dr. James William Gigantelli, an ophthalmologist, testified that he did not consider a CSF leak to be a significant complication of Ms. Coscino's surgery and never heard of a resulting craniotomy.
Dr. John William Shore, an ophthalmologist who has performed 200-250 orbital decompression leaks, testified that the only statistics published report an incidence of 15 CSF leaks resulting from 428 orbital decompression surgeries or an incidence of approximately 3.5%. He stated that the type of intervention required to stop a CSF leak depends on the severity of the leak, the location of the leak, the size of the leak, and circumstances under which the leak was encountered. He explained that the course of treatment could include, progressing from the least to most intrusive: bed rest, a spinal catheter, extracranial surgical procedures, and intracranial surgical procedures.
Contrary to Dr. Wolfley's claim, there was expert testimony given not only as to the rate of occurrence of the risk, but as to the degree of harm associated with the risk. Some experts testified the degree of harm *262 was negligible but another found it significant. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is most credible. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1111 (La.1990). On appellate review the trial court's reasonable factual findings, reasonable evaluations of credibility, and reasonable inferences of fact should not be disturbed. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987). The trial court found the risk of a CSF leak was material. We find no error in the trial court's determination.

ASSIGNMENT OF ERROR NO. 2
Dr. Wolfley asserts that the trial court erred in not admitting evidence of the pattern and practice that he and the LSU Eye Clinic used to obtain informed consent and provide information to patients. Dr. Wolfley cites La.Code Evid. art. 406 in support:
Evidence of a habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. The evidence may consist of testimony in the form of an opinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.
Dr. Wolfley's argument would be persuasive if he wanted to admit evidence that it was his practice and habit to warn all patients about to undergo an orbital decompression that a CSF leak could occur. Rather, Dr. Wolfley contends that the trial court should have admitted evidence to demonstrate that he consistently discussed prospective surgery with his patients and allowed them to ask questions. Such evidence is irrelevant in light of his testimony that he did not explain or even warn Ms. Coscino about the possibility of a CSF leak. When asked why, Dr. Wolfley stated, "I have tried to approach it from the standpoint of [explaining] complications that the patient can understand.... It is very hard for a nonmedical person to understand a cerebral spinal fluid leak especially when every one of them, when they happen, close spontaneously."
Both Dr. Wolfley and Ms. Coscino testified that Dr. Wolfley never warned her about the possibility of a CSF leak. Testimony as to Dr. Wolfley's practice of discussing prospective surgery was irrelevant, and the trial court's ruling on this evidentiary matter was correct.

ASSIGNMENT OF ERROR NO. 3
Dr. Wolfley asserts that the trial court erred when it did not allow him to fully cross-examine Ms. Coscino on the issue of whether she would have consented to the surgery had she known of the possibility of a CSF leak. The trial court would not allow Ms. Coscino to answer hypothetically whether she would have had the surgery if she had known of the risk involved, even though she had been previously deposed on this issue. However, the hypothesis posed to Ms. Coscino did not comport to the facts of this case. Therefore, any answer Ms. Coscino would have given would have been irrelevant. Additionally hypothetical questions are appropriately posed to experts, not lay witnesses. We find no error in the trial court's ruling.

ASSIGNMENT OF ERROR NO. 4
Dr. Wolfley asserts that the trial court erred by not applying an objective standard in finding causation. As stated previously, the second prong of the materiality test in Hondroulis is for the trier of fact to decide whether the probability of that type of harm is a risk which a reasonable patient in the plaintiff's position would consider in deciding on treatment. (Emphasis added). Therefore, the trial court had to determine whether an objectively reasonable person in Ms. Coscino's position would have elected to proceed with the orbital decompression surgery.
Dr. Wolfley argues that the trial court applied a subjective standard and submits the following language from the Reasons for Judgment for support: "If properly advised, it would have been likely (not just reasonable) for her to refuse the third choice, recommended by Dr. Wolfley, since she had the *263 vivid horrible memory of her mother having undergone a craniotomy." We find Dr. Wolfley's argument unpersuasive. The trial court correctly applied the standard set forth in Hondroulis by determining whether it was reasonable that Ms. Coscino would not have consented to the operation had she been fully apprised of the material risks involved. The trial court put itself in the shoes of this particular plaintiff to make an objective determination as to causation. Ms. Coscino had been told that without surgery the painful dryness in her eyes would continue, and that her eyes would continue to protrude. She also knew there was a possibility that the dryness could permanently damage her eyes. On the other hand, Ms. Coscino had the particular history of her mother previously undergoing a craniotomy and an abnormal fear of this surgery.
In some instances, the risk might be so slight and the need for the surgery so great, that no reasonable person would refuse the surgery. However, when the risk is greater or the need for surgery lesser, reasonable patients could differ as to whether they would consent to the surgery. In such cases, in which reasonable persons might differ, the failure to inform the patient of a material risk can be the cause of the harm if the risk materializes. Hartman v. D'Ambrosia, 95-0393 (La.App. 4th Cir. 11/30/95), 665 So.2d 1206, writ denied, 95-3124 (La.2/16/96), 667 So.2d 1060.
Ms. Coscino was not in a life-threatening position; the surgery was to relieve the pain from the dryness of her eyes and reduce the protrusion of her eyes. Considering Ms. Coscino's particular position, we cannot find error in the trial court's determination that it is likely that Ms. Coscino would not have agreed to the surgery had she been warned of the risk of a CSF leak. It certainly is plausible that had she known of the material risks, she might have sought a second or third opinion and proceeded with a more conservative course of action. We find no merit in this assignment of error.

ASSIGNMENT OF ERROR NO. 5
Dr. Wolfley asserts that the trial court abused its discretion by awarding Ms. Coscino $450,000.00 in general damages. The trial court has much discretion in the assessment of damages. La. Civ.Code art. 2324.1. An appellate court should increase or decrease an award only when the amount is beyond that which a reasonable trier of fact could assess for a particular injury upon the particular plaintiff under the circumstances of the case. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, sub nom., 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
General damages do not have a common denominator and must be decided on a case by case basis. Masters v. City of New Orleans, 94-2349 (La.App. 4th Cir. 9/28/95), 662 So.2d 125, 126. General damages include physical pain and suffering, inconvenience, loss of physical enjoyment, and other factors that affect the victim's life. Id. Factors to be considered when assessing quantum for pain and suffering are severity and duration. Id.
The initial inquiry when examining an award is whether the amount awarded for the particular injuries for this particular plaintiff is a clear abuse of the discretion of the trier of fact. Merritt v. Karcioglu, 95-1335 (La.App. 4th Cir. 1/19/96), 668 So.2d 469, aff'd as amended, 96-0431 (La.2/25/97), 687 So.2d 1002; Reck v. Stevens, 373 So.2d 498 (La.1979). In the present case, Ms. Coscino, because of the resulting CSF leak, experienced fluids sporadically leaking from her nose for several months. She underwent bed rest, a spinal tap, and a craniotomy in attempts to correct the constant leak. The residuals of her craniotomy include a diminished sense of taste and smell and phantom smells of wood burning. However, no one testified that her absent sense of smell and taste would be permanent or worsen to a total loss, and Dr. Kott stated that she should see an ENT in reference to this problem. She also experiences occasional double vision and will always have extensive scarring, albeit in her hairline, that will remind her of the surgery she underwent.
However, Ms. Coscino has no residual pain due to her craniotomy. She has returned to work and continues to do her former job. Although Ms. Coscino continues to *264 put salve in her eyes and tape them at night to reduce dryness, she has elected not to undergo a minor procedure that could allow her eyelids to close at night. This surgery would also reduce the protrusion of her eyeballs and allow her a more "normal" appearance.
While this court is sympathetic to Ms. Coscino's tribulations, we find that the trier of fact abused his discretion by awarding $450,000.00 in general damages for the particular injuries that Ms. Coscino suffered.
Once a abuse of discretion is determined, a resort to prior awards is appropriate and then for the purpose of determining the highest and lowest point which is reasonably within that discretion. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). A search of Louisiana cases revealed only one case in which damages were awarded for a craniotomy that was performed to repair a torn dura. In Mayer on Behalf of Mayer v. Tulane Medical Center, 527 So.2d 329 (La. App. 4th Cir.1988), a two year old child fell while at Tulane Medical Center, punctured her dura, and underwent a craniotomy to repair the tear. The residual effect of her surgery was a scar in her hairline from ear to ear. There was no mention of a diminished sense of taste or smell, nor did she suffer from occasional double vision. However, although the appellate court in Mayer believes a child of tender years is more susceptible of being traumatized by this experience than would an adult, we think that Ms. Coscino, more likely than not, was more traumatized than most adults because of her mother's previous surgery and Ms. Coscino's fear of this particular surgery.
Due to the lack of prior jurisprudence on damages awarded for this type of surgery, Mayer must provide us with the requisite guidance for the appropriate range for an award. The appellate court in Mayer reduced the jury award of $312,500.00 to $125,000.00. Although the plaintiff in Mayer will experience the trauma of her surgery and her scarring for a much longer time than Ms. Coscino, Ms. Coscino has more residuals from her surgery, i.e. occasional double vision, phantom smells, and a diminished sense of taste and smell. We find that $175,000.00 is an appropriate award in the present case.
The appellants also aver that the trial court erred in awarding the full amount of the medical bills that were stipulated into evidence without verification of collateral source. The collateral source rule holds that a tortfeasor is not entitled to a credit for payments made to a plaintiff through collateral sources independent of the wrongdoer's procuration or contribution. Dumas v. Harry, 94-19 (La.App. 5th Cir. 5/11/94), 638 So.2d 283, 286. In other words, only payments already made by the tortfeasor can be used to grant the tortfeasor a credit towards the amount of the medical award. Basically, the appellants argue that because Ms. Coscino is insured through her job with the State, and a State subsidiary, the Louisiana Department of Health and Hospitals, is one of the defendants, the amounts paid by her insurance, should be credited against her medical award. We disagree that the collateral source rule can be interpreted so broadly, and the appellants cite no authority for this expanded interpretation.
Accordingly, we affirm the trial court judgment in favor of Ms. Coscino and against the appellants, and we affirm the awards of $40,717.72 in medical expenses and $650.00 in expert witness fees. We reduce the general damages from $450,000.00 to $175,000.00.
AFFIRMED AS AMENDED.
NOTES
[1] La.Rev.Stat. 40:1299.40 was later amended by Acts 1993, No. 633, § 1. However, those amendments were not in effect at the time Coscino gave her consent.
[2] This is a condition in which air gets trapped inside the cranium and can cause severe headaches.