634 So.2d 1347 (1994)
Joseph PLUMBER and Anna Grace Plumber, Plaintiffs-Appellants,
v.
STATE of Louisiana, DEPARTMENT OF HEALTH & HUMAN RESOURCES, Defendant-Appellee.
No. 93-869.
Court of Appeal of Louisiana, Third Circuit.
March 2, 1994.
Writ Denied May 6, 1994.
*1348 Gregory Bryan Dean, for Joseph Plumber and Anna Grace Plumber.
Ronald Joseph Bertrand, Ronald L. Menville, for State, Dept. of Health & Human Resources.
Before GUIDRY, LABORDE and THIBODEAUX, JJ.
GUIDRY, Judge.
Plaintiff, Anna Grace Plumber, suffered a chemical burn on her right hand while undergoing chemotherapy at University Medical Center (UMC) in Lafayette. She and her husband, Joseph, sued the State of Louisiana through the Department of Health and Human Resources (DHHR), alleging several theories of malpractice negligence and the lack of informed consent to undergo the chemotherapy treatment. After trial, the court rendered judgment in favor of DHHR dismissing plaintiffs' action. Plaintiffs appealed.
On appeal, the Plumbers assert as the sole error the trial court's finding that Anna was adequately informed by UMC of material risks and information, and thus gave her "informed consent" to the administration of chemotherapy. They argue that, because UMC did not explain the potential success rate of the treatment, the experimental nature of the treatment, any possible alternatives to chemotherapy, and the possible benefits of chemotherapy, the information given was inadequate and prevented her from giving informed consent. We affirm.

FACTS
On February 17, 1988, Anna underwent surgery to remove a cancerous portion of her colon. The pathology report on the excised portion was inconclusive as to whether the cancer had spread beyond the colon. On February 22, 1988, Dr. John Rainey, M.D., the head of the UMC Oncology Department, recommended to Anna that she receive chemotherapy to reduce the risk of cancer recurrence. Dr. Rainey prescribed eight intravenous treatments at three week intervals consisting of the chemotherapy drugs 5fu, Oncovin, and Mitomycin-C. The latter two are vesicant drugs, meaning that they can cause serious tissue damage if they "extravasate" or leak out of the vein into which they are being injected.
On March 9, 1988, Anna returned to UMC and spoke with Dr. Masoud Yazdi, an internal *1349 medicine specialist, who gave her a three page consent form. The second page identified the three drugs to be administered and listed possible side effects. Dr. Yazdi instructed her to take the consent form home and read them in order to make a decision on whether or not to undergo chemotherapy. The consent form provided, in pertinent part, as follows:
* * * * * *
All chemotherapy drugs can cause severe side effects, and I understand that there may be lesser and unknown side effects, particularly from new drugs. All known side effects have been explained to me and I understand them. Listed below are the drugs and their side effects:
* * * * * *

Mitomycin-C ... If the medicine should leak outside the vein into which it is being infused, a large ulcer may result which may be associated with skin loss and the need for a skin graft.
* * * * * *
All my questions about my disease and this treatment have been answered by /s/ Dr. Yazdi.
I am satisfied that they will continue to answer all my questions, as truthfully and as accurately as possible.
I have read this consent and in the event I am unable to read it, it has been read and explained to me by /s/ Dr. Yazdi. I understand what drugs are being used, what possible risks are involved for me, and what my rights are as a patient undergoing chemotherapy treatment.
Signature: /s/ Anna Grace Plumber
Dr. Yazdi testified that the plaintiff returned to UMC on March 16, 1988, to undergo her first chemotherapy session. According to Dr. Yazdi, he explained the possible complications associated with chemotherapy and actually read the consent form to her. Thereafter, she signed the consent form and proceeded to the Oncology Clinic for her first treatment. During her treatment on that date, Mitomycin-C extravasated from the vein into the surrounding skin tissue and caused a chemical burn in the exposed area.
On April 11, 1988, Dr. Kenneth Laborde, a hand surgeon, diagnosed a third degree chemical burn with skin and tissue loss. He performed a skin graft on May 5, 1988. The graft was not completely successful, and plaintiff has residual tissue damage and a large visible scar on the top of her hand.
At trial, Anna stated that Dr. Yazdi encouraged her to undergo chemotherapy. She decided to take the treatments because she was afraid that, without chemotherapy, she would not live much longer. Anna recognized her signature on the consent form and stated that, while she understood that the side effects "might be a little dangerous", she was not aware of the possibility that she could have a burned hand. She also did not recall Dr. Yazdi explaining the particular drugs nor the potential success rate of treatment.
On cross-examination, however, the following exchange occurred:
Q. All right. At either one of those visits when you were with Dr. Yazdi, did he explain to you the dangers of chemotherapy?
A. The second visit.
Q. The second visit. Okay. What did he tell you could happen to you with chemotherapy? The bad things I'm talking about.
A. He told me I could become dizzy and it could infect my kidneys and he said I could end up with a burn.
Q. He told you you could end up with a burn?

A. On the hand.

Q. Right.
A. And maybe more, but I don't recall. He explained a few more, maybe. (Emphasis ours)
In dismissing plaintiff's suit, the trial judge found that Anna agreed to undergo chemotherapy as evidenced by her signature on the medical consent form. The court also determined that the consent form, which warned of possible side effects with specificity, was read to plaintiff. Without explicitly stating so, it is clear that, given these factual findings combined with the dismissal of plaintiff's *1350 suit, the court concluded that Anna gave her informed consent to the chemotherapy.
The trial judge further concluded that the treatment method utilized by the UMC Oncology Clinic in administering the drugs did not fall below the applicable standard of care. Appellants do not assert error in this conclusion and same is not at issue in this appeal.

OPINION
The Louisiana Uniform Consent Law, La.R.S. 40:1299.40, provides, in pertinent part, as follows:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
It is not disputed and is clear from the record that plaintiff was adequately informed with specificity concerning the risk of extravasation and the chemical skin burn which resulted. Plaintiff contends, however, that her consent was not sufficiently informed because neither Dr. Yazdi nor any other UMC staff member explained the following: the potential success rate and experimental nature of the treatment, alternatives to chemotherapy, and the possible benefits of chemotherapy.
In Hondroulis v. Schuhmacher, 553 So.2d 398 (La.1988), on rehearing at 410, 417, the Louisiana Supreme Court held that a consent form signed by the patient establishes a "rebuttable presumption of consent to encounter risks adequately described in the consent form, subject to the patient's right to overcome the presumption that consent was induced by material misrepresentation". In order for a reasonable patient to be aware of a risk, she should be told in lay language the nature and severity of the risk and the likelihood of its occurrence. Hondroulis, supra, at 421. The patient cannot disprove the presumed informed consent unless she shows misrepresentation on the part of the health care provider. On remand, our brethren of the Fourth Circuit explained that the presumption may be rebutted by proving that (1) there is a material risk which the physician has a duty to disclose; (2) the physician failed to inform the patient about a material risk; (3) the material risk was realized; and, (4) there is a causal connection between the failure to inform the patient of the risk and realization of the risk. Hondroulis v. Schuhmacher, 612 So.2d 859 (La.App. 4th Cir. 1992), writ not considered, 615 So.2d 335 (La.1993).
In the present case, the informed consent presumption arises because Anna signed a medical consent form which clearly explained the material risk that eventually occurred. On appeal, plaintiff does not allege that a separate material risk was withheld from her knowledge in connection with the information presented. She argues that material information which would have affected her decision, was not properly disclosed. In support of her argument, she relies upon language from the Louisiana Supreme Court's opinion in Hondroulis, 553 So.2d at 411, wherein the court stated:
Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment....
*1351 Our careful review of the record reveals that the proposed treatment regimen was not experimental in nature. Additionally, it is clear that Dr. Yazdi explained that the benefit of chemotherapy was the possible reduction of the risk of cancer recurrence. Contrarily, it is evident that the prospects of success and the risks of alternatives to chemotherapy were not explained to Anna.
The doctrine of informed consent is based principally upon the disclosure to patients of material risks of particular medical procedures. Its policy is to adequately inform the patient of complications that may result and eventually cause damage so that the patient may then weigh the risks against the potential benefits and make a knowledgeable and intelligent decision. While the factors withheld are properly characterized as material information rather than material risks, they are factors which should also be disclosed where circumstances permit.
The proof of nondisclosure of material information, by itself, is not sufficient to allow plaintiffs to recover. A plaintiff must prove causation based upon an objective standard, due to the likelihood of patient bias in testifying in hindsight. A plaintiff is required to prove, by a preponderance of the evidence, that a reasonable patient in her position would not have consented to the treatment or procedure had the material information or risk been disclosed. Hondroulis, 553 So.2d at 412, and the cases cited therein.
The evidence indicates that the treatment was successful in preventing a recurrence after five years in seven to ten percent of the cases. It was unclear why certain patients responded more positively than others. The chemotherapy in situations such as the instant case are viewed as a precautionary measure to prevent the cancer from returning or spreading. Plaintiff herself testified that someone at UMC told her that she was not a candidate for radiation therapy, another widely used cancer treatment. In conventional medical wisdom, the alternative to chemotherapy in this situation would simply be to not undergo chemotherapy.
The trial court's determination that Anna gave her informed consent to this particular chemotherapy treatment is factual in nature. As such, that conclusion is afforded great deference on appeal and will not be disturbed absent manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989). Under these circumstances, we conclude that a reasonable patient in plaintiff's position, one who had recently undergone serious cancer removal surgery for which the question of whether the cancer had spread was pathologically inconclusive, would not have declined chemotherapy had the material information concerning the prospects of success and the lack of known alternative treatment been disclosed to her. Even with information concerning the relatively low documented positive response rate, a reasonable patient who feared the recurrence of cancer would not have foregone chemotherapy in this situation in favor of no treatment whatsoever. The trial court's determination is not manifestly erroneous.
For these reasons, the trial court's judgment is affirmed. Costs of this appeal are assessed to appellants.
AFFIRMED.