STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

03-1165

KATHERINE C. MANNINA AND JOHN M. MANNINA

VERSUS

DR. THOMAS A. BORLAND, ET AL.

**********
APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 83,161
HONORABLE GERARD B. WATTIGNY, DISTRICT COURT JUDGE

**********
ULYSSES GENE THIBODEAUX
CHIEF JUDGE
**********

Court composed of Ulysses Gene Thibodeaux, John D. Saunders, and Arthur J. Planchard[*], Judges.

AFFIRMED.

John Wheadon deGravelles
Scott H. Frugé
deGRAVELES, PALMINTIER, HOLTHAUS & FRUGÉ
618 Main Street
Baton Rouge, LA 70801-1910
Telephone: (225) 344-3735
COUNSEL FOR:
        Plaintiff/Appellee - Katherine C. Mannina and John M. Mannina

Marc W. Judice
Judice & Adley
P. O. Box 51769
Lafayette, LA 70505-1769
Telephone: (337) 235-2405
COUNSEL FOR:
        Defendants/Appellants - Thomas A. Borland, M.D. and/or The
        Surgery Clinic and Louisiana Medical Mutual Insurance Co.

---

[*]Honorable Arthur J. Planchard, retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

Thibodeaux, Chief Judge.

In this medical malpractice/informed consent case, the defendants, Dr. Thomas A. Borland (Dr. Borland) and his insurer, Louisiana Medical Mutual Insurance Company (Louisiana Medical), appeal the judgment of the trial court in favor of the plaintiffs, Katherine and John Mannina, which found that Dr. Borland failed to obtain Mrs. Mannina's informed consent prior to performing varicose vein surgery. For the following reasons, we affirm the judgment of the trial court.

I.

**ISSUES**

The first issue on appeal in this case is whether Mrs. Mannina was properly informed by Dr. Borland of the risks and complications associated with undergoing sclerotherapy procedure to rid her legs of varicose veins. The second issue on appeal in this case is whether Dr. Borland was required to obtain written consent from Mrs. Mannina prior to performing the varicose vein removal procedure.

II.

**STANDARD OF REVIEW**

The trial court's determination that Mrs. Mannina did not give her informed consent to this particular sclerotherapy procedure is factual in nature. As such, that conclusion is afforded great deference on appeal and will not be disturbed absent manifest error. *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

1

III.

**FACTS**

After becoming pregnant with her second child, Mrs. Mannina developed varicose veins on her legs. She mentioned her varicose vein problem to her neighbor, Laura Gaspard, who at the time worked for Dr. Borland as his office manager. Ms. Gaspard told Mrs. Mannina that Dr. Borland could treat her varicose veins. On October 5, 1992, Mrs. Mannina saw Dr. Borland. The doctor informed Mrs. Mannina that he could not do anything for her varicose veins until after her child's birth.

In April 1993, one month after she had her baby, Mrs. Mannina saw Dr. Borland again. A Doppler exam performed on that day revealed that she had good blood flow through her femoral vein and no blockages. Thus, Mrs. Mannina was a good candidate for the sclerotherapy procedure. Mrs. Mannina testified that she and Dr. Borland then talked about the sclerotherapy procedure. She told Dr. Borland that she was concerned about the disfigurement the varicose veins caused. After her visit with Dr. Borland, Mrs. Mannina saw Dr. Ingram at the Vein Disorder Clinic in Lafayette, Louisiana for a second opinion. She then made the decision to have Dr. Borland perform the procedure. Mrs. Mannina testified that she chose Dr. Borland because he told her he could treat her varicose veins by injecting the veins of her foot, a procedure Dr. Ingram did not recommend that anyone undergo.

Mrs. Mannina did not know how many times Dr. Borland had performed the procedure. Dr. Borland testified that he had performed five sclerotherapy procedures prior to conducting the procedure on Mrs. Mannina. Mrs. Mannina further testified that had she known that the doctor had done so few sclerotherapy procedures prior to hers, she would not have allowed Dr. Borland to perform the

2

sclerotherapy. Dr. Borland testified that his training in the procedure consisted of observing one doctor do one sclerotherapy procedure on one day. This fact was also unknown by Mrs. Mannina. Both Dr. Borland and Mrs. Mannina testified that he gave her a pamphlet explaining the procedure. It is undisputed that he did not have Mrs. Mannina sign a written consent form prior to performing the procedure.

Dr. Borland described varicose and spider veins as follows:

[It is] a vein usually in lower extremities. It doesn't have to be in lower extremities, but they're usually are a normal vein that develops incompetent valves and then dilates, and that's due to pressure in the venous system that develops in those veins and usually associated with pregnancy. After pregnancy, a lot of females will develop varicose veins.

The spider veins are just smaller. They have incompetent perforators. Those are veins that go from the deep venous system to the superficial venous system and they'll start spreading. You'll see them dilate. They initially start out as small red, or they become more cyanide, and then they'll turn blue as they get larger, and then almost a blue-green appearance as they get really big.

Essentially, Dr. Borland testified that the veins in the legs sometimes experience a breakdown of the valves. The calf muscles contract to pump blood out of the foot. The valves stop the blood from "regurgitating" back to the leg and foot when the calf muscle relaxes which prevents pressure in the leg. A faulty valve increases the blood volume down the leg and to the foot which causes varicose veins. Eventually, a patient with varicose veins will develop swelling and itching.

With respect to the sclerotherapy, Dr. Borland testified that it is not a cutting type of medical procedure. During the procedure a chemical agent is placed into the vein using needles and then compression is applied to the area which results in permanently sealing the vein. Mrs. Mannina's description of the procedure closely matches that of Dr. Borland. Mrs. Mannina was placed in an upright position in order

to dilate the veins so that they could be located.  After the location of the veins were marked, Mrs. Mannina was allowed to lie down with her legs placed at a forty-five degree angle.  Needles were then placed in the veins where marked and fluid was injected.  Mrs. Mannina then had to wear specialized compression stockings to achieve uniformity of compression in her legs.

Mrs. Mannina testified that during the procedure she felt a little stinging from the injected medication.  Following the procedure, Mrs. Mannina walked as instructed by Dr. Borland.  Mrs. Mannina testified that Dr. Borland told her that the more walking she does after the procedure, the better the outcome.  Subsequently, Mrs. Mannina began experiencing severe pain in her legs.  Her neighbor and Dr. Borland's then office manager, Ms. Gaspard, contacted Dr. Borland for Mrs. Mannina.  According to Mrs. Mannina, Dr. Borland never called her but Ms. Gaspard told her that the doctor said that the pain she felt was normal and to continue walking.

Seven days after the sclerotherapy, Mrs. Mannina saw Dr. Borland for a follow-up visit.  The bandages, foam and tape were removed from her legs.  It was at this time that she saw "gruesome ulcerations all over [her] leg and deep wounds where [she] could see flesh underneath the wound."  Mrs. Mannina said the wounds were from anywhere between 1/8 and 1/4 inch deep.  She said that when the bandages were removed, there was not a sound in the room.  She further testified that she was very disappointed in the results.  Dr. Borland prescribed an antibiotic cream that she was to rub on her legs everyday.  Mrs. Mannina testified that he reassured her that the wounds would heal.

Mrs. Mannina testified that she was not told of the possibility of developing deep wounds as a result of the sclerotherapy procedure.  Dr. Borland testified that he did not remember whether he specifically told Mrs. Mannina about

4

the risk of ulcerations but that it was his usual practice to do so. According to Ms. Gaspard, she was in the room with Dr. Borland when he first examined Mrs. Mannina. She recalls that Dr. Borland informed Mrs. Mannina of the possibility of developing ulcerations.

Ultimately, the Manninas filed a lawsuit alleging that Dr. Borland's treatment of Mrs. Mannina deviated from the accepted standard of care required when performing a sclerotherapy procedure and that Dr. Borland failed to obtain the informed consent of Mrs. Mannina. At the conclusion of the trial, the trial court found that Dr. Borland did not deviate from the accepted standard of care when he performed the sclerotherapy procedure. However, the trial court did find that Dr. Borland failed to obtain Mrs. Mannina's informed consent. The trial court also found that Dr. Borland should have obtained written consent from Mrs. Mannina to perform the sclerotherapy procedure. Dr. Borland appeals the trial court's finding that he did not obtain Mrs. Mannina's informed consent and that her consent needed to be in writing.

IV.

**LAW AND DISCUSSION**

***Informed Consent***

The parties disagree regarding whether Mrs. Mannina was told about the possibility of developing sores on her legs as a result of undergoing the sclerotherapy procedure. Dr. Borland contends that the type of procedure he performed on Mrs. Mannina did not require written consent. The trial court noted, in its reasons for judgment, the lack of written consent. A patient in an informed consent case bears the burden of proof and must show: (1) the existence of a material risk which the physician must disclose; (2) the failure of the physician to inform the patient of a

5

material risk; (3) the realization of the material risk; and, (4) a causal connection between the failure to inform the patient of the risk and realization of the risk. *Hondroulis v. Schumacher*, 553 So.2d 398 (La.1988)).

The Louisiana statutory directives regarding informed consent are found in the Uniform Consent Law at La.R.S. 40:1299.40, which reads, in part:

> A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
>
> . . . .
>
> C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (1) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.

Mrs. Mannina has suffered deep wounds and disfiguring scars on her legs. As noted above, our first inquiry is whether a material risk existed in this case.

6

The doctor's duty is to disclose all material risks and the test for materiality is two-pronged. The *Hondroulis* court explained:

> The factors contributing significance to a medical risk are the incidence of injury and the degree of the harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small. But if the chance of harm is slight enough, and the potential benefits of the therapy or the detriments of the existing malady great enough, the risk involved may not be significant even though the harm threatened is very great.

> The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a *reasonable person in the patient's position probably would attach significance to the specific risk.* This determination of materiality does not require expert testimony.

*Hondroulis*, 553 So.2d at 412. (Emphasis ours) (Citations omitted.)

There is ample evidence in the record to satisfy the first prong of the *Hondroulis* materiality test. Dr. Borland admitted that the sclerotherapy procedure involves the risk of ulcerations resulting in scarring of the patient's legs. According to Dr. Richard Dean Dillman, a vascular surgeon, ulceration leading to scarring is a "common" risk associated with sclerotherapy. Dr. Darrell L. Henderson, a plastic surgeon, saw Mrs. Mannina after her treatment by Dr. Borland and examined the scarring on her legs. Mrs. Mannina gave him a history of having her bandages removed on April 8, 1993, and seeing open wounds on both legs at injection sites and places where the bandages were placed. It took several months for the wounds to heal and they left scarring. Dr. Jon V. Schellack, another vascular surgeon and the

7

surgeon with whom Dr. Borland did his sclerotherapy training, testified that an ulcer can occur during the treatment when the injected agent, used to treat the vein, escapes from the vein and goes into the tissue around the vein causing damage to the skin. According to Dr. Schellack, the skin dies, develops a scab, turns into an ulcer and ultimately, a scar. This process can happen when the needle is removed or if the wall of the vein breaks allowing leakage of fluid. Dr. Schellack testified that a patient should only experience minimal pain during the injection procedure and if the patient experiences severe pain then that is a sign that some of the fluid is going outside of the vein. Dr. Schellack opined that a patient should be informed of the risk of ulceration and scarring because it is likely that some fluid may escape a vein, leading ultimately to scarring. The trial court found that the likelihood of ulceration leading to scarring was enough to satisfy the first prong of the *Hondroulis* Test. We find no error in the trial court's decision with respect to that fact.

Mrs. Mannina was a young woman in her early thirties, with two young children and was a kindergarten teacher, when Dr. Borland performed the sclerotherapy procedure. Prior to her first pregnancy she had some varicose veins. During her second pregnancy she developed more varicose veins. She wanted to get rid of the veins so upon the recommendation of her neighbor, Ms. Gaspard, Dr. Borland's office manager, she sought treatment to rid her legs of the varicose veins. Her reason for seeking removal of the veins was because they were unsightly and she felt self-conscious about the appearance of her legs. After seeing Dr. Borland, she sought a second opinion from Dr. Ingram, however, she subsequently decided to allow Dr. Borland to perform the procedure. Dr. Borland told her that after the procedure the area where her veins were would darken but eventually fade. We find, as did the trial court, that the risk of ulcerations leading to scarring of the legs is a risk

8

a patient in the position of Mrs. Mannina would consider when making a decision to have the sclerotherapy procedure. A patient concerned about the appearance of her legs would certainly want to know the probability that her legs would look worse after the procedure due to potential ulceration and scarring that could take years to heal.

In the present case, the dispute lies in whether Dr. Borland informed Mrs. Mannina of the material risk of ulceration and scarring prior to the sclerotherapy procedure. The trial court concluded that he did not. We agree.

Dr. Borland testified that he always tells his patients about the risk of ulceration. However, he could not remember whether he specifically told Mrs. Mannina. Ms. Gaspard testified that she was in the room when Dr. Borland told Mrs. Mannina about the risk of ulceration. However, she did not state that Mrs. Mannina was told about long-term scarring. Further, there is no evidence that Dr. Borland explained what it meant to have an ulceration. Dr. Borland attempted to support his position by stating that he gave Mrs. Mannina a pamphlet on the procedure as well as a videotape depicting the procedure which informed her of the risks. Our review of the pamphlet reveals no such warning. With respect to the videotape, the trial court found that the tape did not reveal the risk of ulceration and long-term scarring. The videotape is divided into two sections. In the first section there is a doctor performing the sclerotherapy procedure. However, it is not geared toward informing the patient and appears it was produced to teach a physician how to perform the procedure. The second part of the videotape describes the history of the treatment of varicose veins through various methods including, but not limited to, sclerotherapy. Near the end of the tape, a doctor mentions the risk of ulceration after a sclerotherapy procedure and a photo of a leg with an ulceration is shown. However, we find that

9

even this part of the tape was not sufficient to inform Mrs. Mannina of the risk of ulceration and scarring. First, it did not mention the risk of long-term scarring. "In order for a reasonable patient to be aware of a risk, she should be told in lay language the nature and severity of the risk and the likelihood of its occurrence." *Plumber v. State, Dept. Health & Human Resources,* 93-869, p. 5 (La.App. 3 Cir. 3/2/94), 634 So.2d 1347, 1350, *writ denied,* 94-811 (La. 5/6/94), 637 So.2d 1056, (citing *Hondroulis*, 553 So.2d at 421). Moreover, the language used in the second part of the video did not use lay language in conveying the risk of ulceration. Like the first part of the video, the purpose of the second part was to educate physicians regarding the history and present treatment of varicose veins as well as the discovery of the causes of varicose veins and was not limited to the use of the sclerotherapy procedure. Thus, Dr. Borland's assertion that the videotape informed Mrs. Mannina of the ulceration and scarring risk is without merit.

Dr. Borland further argues that because Mrs. Mannina had a second opinion regarding the surgery, she was informed of the risks of the surgery and also underwent a second similar procedure from another doctor subsequent to the procedure that is the subject of the present appeal. With respect to her second varicose vein removal procedure, there is nothing in the record indicating the method used, the results of that procedure or when she had it done. Further, the fact that she underwent a similar procedure is not proof that she knew of the risks of ulcerations and scarring and would have consented to Dr. Borland's sclerotherapy procedure. This argument is without merit.

There is no question the material risk of leg disfigurement occurred. When the bandages were removed subsequent to the prescribed recovery time, Mrs. Mannina's legs exhibited several open wounds, which ultimately developed into

scars. The scarring that resulted from the ulcerations was so bad that Mrs. Mannina sought treatment from a plastic surgeon.

We further agree with the trial court that there is a causal connection between Dr. Borland's failure to inform Mrs. Mannina and the realization of the risk. "[W]hen the risk is greater or the need for surgery lesser, reasonable patients could differ as to whether they would consent to the surgery. In such cases, in which reasonable persons might differ, the failure to inform the patient of a material risk can be the cause of the harm if the risk materializes." *Coscino v. Wolfley*, 96-702, p. 9 (La.App. 4 Cir. 6/4/97), 696 So.2d 257, 263, *writs denied*, 97-2317, 97-2539 (La. 1/9/98), 705 So.2d 1100, 1102. Mrs. Mannina was not suffering from a life-threatening condition. The sclerotherapy procedure was to rid her legs of unsightly veins. Therefore, we agree with the trial court's finding that Mrs. Mannina would have refused treatment had she been made aware of the possibility of major, long-term scarring to her legs.

### *Written Consent*

Throughout his written reasons for ruling, the trial court found that Dr. Borland did not obtain a written consent from Mrs. Mannina and, in fact, it was conceded by Dr. Borland that written consent for this procedure was never obtained. However, Dr. Borland argues that he did not have to inform Mrs. Mannina in writing and have her sign a consent form because La.R.S. 40:1299.40(C) requires that patients be given an opportunity to ask questions. We find that the contention of Dr. Borland misstates the requirements of La.R.S. 40:1299.40(C).

The Louisiana Legislature has not determined what medical procedures should require a patient to sign a written consent or what medical procedures should

11

require some lesser form of patient consent. Accordingly, we must turn to the Uniform Consent Law embodied in La.R.S. 40:1299.40.

Louisiana Revised Statutes 40:1299.40(C) allows a patient to consent to medical treatment, other than in writing, under specific circumstances. The patient must be informed, in general terms, of the nature and purpose of the procedure, together with the possible known risks of the procedure of death, brain damage, quadriplegia, paraplegia, the loss of function of any organ or limb and of disfiguring scars. Furthermore, the patient must acknowledge that such disclosure has been made and an opportunity to ask questions and receive answers must take place. If these conditions are not met, the patient is deemed not to have given their informed consent to the procedure.

In our opinion, Dr. Borland did describe and discuss, in general terms, with Mrs. Mannina the nature and purpose of the procedure. Dr. Borland may also have given her the opportunity to ask questions about the procedure. However, the potential known risks of the procedure were not disclosed to Mrs. Mannina as required by La.R.S. 40:1299.40(C). The trial court found, and we agree, that the video tape supplied by Dr. Borland was not sufficient to inform Mrs. Borland of the potential risks associated with this procedure. As such, Dr. Borland's failure to adhere to all of the requirements of La.R.S. 40:1299(C) negates the possibility that informed consent to this procedure was obtained from Mrs. Mannina.

V.

**CONCLUSION**

For the above reasons, the judgment of the trial court concluding that Dr. Borland did not obtain the informed consent of Mrs. Mannina prior to conducting the sclerotherapy procedure, is affirmed at defendant-appellant's cost.

**AFFIRMED.**

12